**IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 691 CAP |
| | : |
| Appellee | : Appeal from the Judgment of Sentence |
| | : entered on 05/24/2012 (amended |
| | : post-sentence motions denied on |
| v. | : 11/27/2013) in the Court of Common Pleas, |
| | : Criminal Division of Northampton County at |
| | : No. CP-48-CR-0003415-2011. |
| GEORGE HITCHO JR., | : |
| | : SUBMITTED:   September 22, 2014 |
| Appellant | : |

<u>**OPINION**</u>

**MR. JUSTICE STEVENS**[1]     **DECIDED:   September 29, 2015**

This is a direct appeal from a death sentence imposed after a jury convicted George Hitcho, Jr. ("Appellant") of first degree murder.[2]   At the penalty phase, the jury found one aggravating circumstance and three mitigating circumstances, unanimously determined the aggravating circumstance outweighed the mitigating circumstances, and sentenced Appellant to death.   For reasons that follow, we affirm Appellant's conviction and judgment of sentence.[3]

---

[1] This case was reassigned to this author.

[2] 18 Pa.C.S. § 2502(a).

[3] This Court automatically reviews direct appeals from the imposition of death sentences pursuant to 42 Pa.C.S. § 9711(h)(1).

The record indicates that, on August 11, 2011, at approximately 5:00 p.m., William M. Clancy, whose backyard was approximately seventy-five yards from Appellant's residence, observed Appellant driving his speeding pickup truck on an alley in front of Mr. Clancy's home. After Appellant parked his pickup truck alongside his backyard, which abutted the alley, Mr. Clancy yelled, "Slow the fuck down, asshole." N.T. 5/14/12, jury trial, at 77. Mr. Clancy and Appellant began arguing, and after Appellant "pulled his pants down and mooned" Mr. Clancy, he went inside his residence and called 911. Id. at 79. Mr. Clancy went back outside and observed Appellant holding a two-by-four piece of lumber. With Mr. Clancy still communicating with the 911 operator, Mr. Clancy and Appellant continued to argue and Appellant again "mooned" Mr. Clancy. As Appellant angrily stalked back to his residence, he passed Robert Henninger and Todd Schaedel, who were standing in the alley.

As a result of the 911 call, Freemansburg Police Officer Robert Lasso, who was on duty and dressed in full uniform with the word "POLICE" emblazoned on the back, was dispatched to Mr. Clancy's residence, where he arrived in his marked police vehicle approximately two minutes after the neighbor dispute had ended. Officer Lasso asked Mr. Clancy for Appellant's whereabouts, and Mr. Clancy pointed up the alley in the direction of Appellant's residence. Officer Lasso drove his police vehicle to the rear of Appellant's residence, and when he disembarked, he asked Mr. Henninger for Appellant's location. Mr. Henninger responded Appellant was in his backyard, and as Officer Lasso walked toward the gate to Appellant's backyard, Mr. Henninger heard Officer Lasso call out to Appellant, "George, please talk to me, come out to talk to me." Id. at 167. Mr. Henninger and Mr. Schaedel both heard Appellant's dogs barking, and

Mr. Schaedel heard Officer Lasso instruct Appellant, "[C]ontrol your dogs." Id. at 125, 132. Mr. Schaedel additionally heard some muffled conversation between Appellant and Officer Lasso.

Meanwhile, at some point, Officer Lasso called for back-up, and Police Chief George S. Bruneio, who was one quarter of a mile away at the police station, responded to the request. Chief Bruneio arrived at Mr. Clancy's residence within two or three minutes after receiving Officer Lasso's request for back-up, and he observed Officer Lasso's police vehicle parked near Appellant's backyard. Chief Bruneio parked his police vehicle behind Officer Lasso's police vehicle, disembarked, and as he asked Mr. Henninger and Mr. Schaedel, who were still at the scene, where Officer Lasso was located, he heard a "commotion" in Appellant's backyard. Accordingly, Chief Bruneio went over to the backyard gate.

Upon approaching the gate, Chief Bruneio noticed Officer Lasso positioned by Appellant's patio, approximately five feet from the rear door of the residence and with his back to the door. Chief Bruneio saw Officer Lasso attempting to fend off two large snarling dogs who were threatening Officer Lasso. Specifically, Chief Bruneio observed Officer Lasso, who had a taser[4] in his left hand pointed toward the sky, kicking at the dogs. Officer Lasso's sidearm, a .40 caliber Glock, was in his holster.

Chief Bruneio drew his own sidearm, which was also a .40 caliber Glock, and entered the backyard. Intending for Officer Lasso to use his drawn taser on one of the dogs, while he was going to shoot the other dog, Chief Bruneio yelled out to Officer Lasso,

---

[4] A taser is a non-lethal weapon that delivers an electrical current designed to immobilize a suspect for police purposes. Id. at 211-12.

"[S]hoot 'em." Id. at 208. Immediately, before either officer took any action towards the dogs, and with Officer Lasso still pointing his taser towards the sky, "a loud shot rang out," and Officer Lasso fell facedown to the ground, lying motionless by the patio. Id. at 210, 242. The dogs became startled and ran past Chief Bruneio, who went down on one knee and searched for the direction from which the gunshot originated. From his vantage point, Chief Bruneio was unable to see inside the house and, thus, he was unaware that Appellant was standing at the residence's rear door. Approximately twenty to thirty seconds elapsed from the time Chief Bruneio first observed Officer Lasso until the moment when Officer Lasso was shot.

Suddenly, Appellant emerged from the back door, holding a 12-gauge shotgun with the barrel pointed skywards. Appellant had his left hand on the pump of the shotgun and his other hand on the trigger. With his sidearm trained on Appellant, Chief Bruneio ordered Appellant to drop the shotgun, and Appellant replied, "[H]e's trying to get in my house." Id. at 214. Chief Bruneio again ordered Appellant to drop the shotgun, and Appellant replied, "[H]e tried to break in my house." Id. Chief Bruneio became "very stern," and ordered Appellant to "drop it now." Id. As Chief Bruneio made these commandments, he realized Appellant's shotgun had jammed after Appellant shot Officer Lasso, thus rendering the shotgun temporarily inoperable.

After the third commandment, Appellant complied and placed the shotgun on nearby steps. Chief Bruneio handcuffed Appellant and placed him in his police vehicle. Chief Bruneio then ran back to where Officer Lasso was lying motionless surrounded by a pool of blood emanating from a large shotgun wound to the base of his skull. Chief Bruneio could not detect a pulse.

Meanwhile, uniformed Bethlehem Township Police Sergeant Gregory Gotschall and Officer Robert Stametz, who had heard Officer Lasso's initial request for back-up, arrived at the scene, and Chief Bruneio told them, "It's too late. He shot Robert. Robert's dead." Id. at 260. Sergeant Gotschall observed Officer Lasso's body on the ground, unsuccessfully attempted to find a pulse, and then asked Chief Bruneio where the shooter was located. Chief Bruneio informed the officers the shooter was in custody in the rear of his police vehicle.

Sergeant Gotschall instructed Officer Stametz to "pat-down" Appellant for weapons, and as he was preparing to do so, Officer Stametz noticed there was blood on Appellant's hands and the handcuffs. Because he did not have gloves with him, Officer Stametz asked another responding officer, Lower Saucon Township Police Officer Robert Winters, to pat-down Appellant, and Officer Stametz left to assist Sergeant Gotschall with securing Appellant's residence. As Officer Winters patted down Appellant, Bethlehem Police Officer Richard Hoffman held Appellant. The pat-down did not reveal any contraband; however, after it was completed, and as Officer Hoffman was placing Appellant into the police vehicle, Appellant spontaneously stated, "I'm tired of that son of a bitch always coming on my property and trespassing. I know my rights. I was defending my property. He was trying to come in my back door." Id. at 298-99. Officer Hoffman said nothing in response, closed the police vehicle door, and ran to attempt to render aid to Officer Lasso.

After Officer Lasso was removed from the scene by ambulance personnel, the responding officers were huddled around the scene looking at each other in disbelief. Realizing no one was guarding Appellant, Officer Hoffman sprinted to the vehicle and

when he looked through the window, Appellant gave him "a thousand yard stare" indicative of someone who is very agitated.   Id. at 301.

Subsequently, at approximately 5:27 p.m., Pennsylvania State Police troopers, including Troopers Seth J. Kelly and Dennis Sims, Jr. arrived on the scene.   At approximately 6:32 p.m., the troopers removed Appellant from Chief Bruneio's police vehicle and placed him in the rear seat of a Pennsylvania State Police cruiser for purposes of transporting him to the police station.   As Trooper Kelly sat beside Appellant in the rear seat, Trooper Sims advised Appellant he was being subjected to audio and video recording, and he turned the camera so that it would face Appellant.   Appellant spontaneously stated, "Hey, I'm on candid camera."   Id. at 314; N.T. 5/15/12, jury trial, at 125.   The troopers then transported Appellant to the police barracks.

Troopers subsequently collected the clothes, which Appellant was wearing, and after securing a search warrant, at 10:39 p.m., troopers searched Appellant's residence, taking photographs and seizing various items, including ballistic vests, numerous firearms, ammunition, marijuana plants, and drug paraphernalia.

Appellant was charged with first degree murder, and the Commonwealth provided notice of its intention to seek imposition of the death penalty.   Appellant filed pre-trial motions, including motions for a change of venue and/or venire, to suppress evidence seized by the police, and to suppress statements Appellant made to the police.   On January 27, 2012, the trial court held a hearing, at which the Commonwealth presented the testimony of seven police officers, and in an opinion and order filed on April 20, 2012,

the trial court substantially denied Appellant's motions.[5]  Moreover, Appellant filed several motions in limine challenging Pennsylvania's capital sentencing scheme, seeking to exclude evidence of the firearms legally seized by police from Appellant's residence, and seeking to exclude the autopsy photographs.  The trial court substantially denied these motions.[6]

Following voir dire, the guilt phase of Appellant's jury trial commenced on May 14, 2012.  At trial, the Commonwealth presented evidence from a number of civilian and police witnesses, who testified about the time line and investigation of the shooting as described supra.  Additionally, Dr. Barbara Bollinger, a forensic pathologist who performed the autopsy on Officer Lasso's body, testified, to a reasonable degree of medical certainty, that Officer Lasso died from a shotgun wound to the back of his head and neck and the manner of death was homicide.  N.T. 5/14/12, jury trial, at 69.  Dr. Bollinger testified the head and neck areas are vital parts of the human body, the wound inflicted upon Officer Lasso was not survivable, and Officer Lasso died within seconds of being shot.  Id. at 70-71.  Dr. Bollinger noted a 12-gauge shotgun, such as was used to shoot Officer Lasso, has the ability to create and inflict more damage to a greater surface area than other types of firearms, such as a .38 caliber handgun or rifles.  Id. at 70.

---

[5] The one exception is the trial court granted Appellant's motion to suppress a statement contained in Trooper Gregg M. Dietz's investigation report related to Appellant allegedly informing Chief Bruneio immediately after the shooting that he had "a couple" to drink. See Trial Court Opinion dated 11/27/13 at 4 n.1.

[6] As discussed more fully infra in Section II of this Opinion, the one notable exception is the trial court granted Appellant's motion to exclude a specific Mossberg 12-gauge shotgun, which the police lawfully seized from Appellant's residence.

Moreover, Trooper Kurt J. Tempinski, a forensic firearm expert, confirmed the 12-gauge shotgun seized after Officer Lasso's death was operable.   N.T. 5/15/12, jury trial, at 79.

The defense presented testimony from numerous witnesses, including Appellant. The witnesses were called to support Appellant's attempt to reduce his level of culpability by suggesting that, although Appellant shot Officer Lasso, he did so without the mens rea necessary for first degree murder.   More specifically, Appellant argued he shot Officer Lasso in the "heat of passion," under an unreasonable belief that deadly force was required to save his life ("imperfect self-defense"), or under a diminished capacity due to cognitive impairments.

For example, Appellant testified that, at approximately 4:30 p.m. on the day of the shooting, he went to a local bar and consumed two beers after work.   N.T. 5/16/12, jury trial, at 106-07.   He then proceeded to drive to his house and, after he passed Mr. Clancy's house, Mr. Clancy began shouting profanities at him.   Id. at 109.   Appellant admitted he walked towards Mr. Clancy's house while carrying a piece of wood, and Mr. Clancy telephoned 911.   Id. at 110-12.

Appellant indicated that, as he was walking down the steps onto his own property, Officer Lasso arrived on the scene in his police cruiser and informed Appellant he needed to talk to him about the neighborhood dispute.   Id. at 113.   Appellant asked if he could first let his dogs out since they had been in the house for eight hours, and Officer Lasso replied, "[N]o problem."   Id.   Leaving Officer Lasso standing by his cruiser, Appellant entered his residence via the back door and two of his dogs, a German shepherd and an American bulldog, ran outside.   Id. at 114.   Appellant denied that he permitted his dogs

to run outside with the intent of having them menace Officer Lasso, and he indicated they have a "really good" temperament. Id.

Appellant then proceeded to the basement to check on a litter of puppies, and while he was doing so for approximately one or two minutes, he heard "banging on [his] back door." Id. at 118-19. Appellant testified he initially assumed one of his friends was banging on the door, but as he went up the stairs and the banging became louder, Appellant went "into [a] scared stage because somebody just broke in [his] house about two weeks" prior to August 11, 2011. Id. at 119. Appellant testified the banging sounded like someone was "kicking in" his back door and, when he approached the door area, he saw someone pointing what he believed to be a gun at him saying harshly "open the door or I'm going to shoot you and kill your dogs." Id. at 121. Appellant claimed he did not hear his dogs barking while he was in the basement and he could not initially identify the person who was standing at his back door. Id. at 121-22. Appellant testified he was afraid for his life and, when the person told him a second time to open the door or he would shoot him and his dogs, he "soiled" his pants and "was about as scared as you can get." Id. at 122.

Appellant testified that, as of this time, he assumed Officer Lasso was still in the alley waiting for him and, as it relates to the person banging on and kicking at the back door, Appellant was focused on the object, which the person pointed right at Appellant. Id. at 122. Appellant indicated the person then turned and, standing with his back approximately two feet from the back door, pointed the object at Appellant's dogs, resulting in Appellant fearing for his dogs' lives. Id. at 124-25. Appellant reiterated he believed the object to be a gun, and in fact, it looked like his gun, which had recently been

stolen from his home. Id. at 125. Appellant indicated the banging, yelling, and forceful nature of the person led Appellant to believe the person was serious about killing his dogs. Id. at 125.

Appellant testified he then heard someone yell, "Shoot 'em," and Appellant thought the statement was a command for the person at the door to shoot Appellant. Id. at 126. At this point, Appellant picked up his shotgun, which was by the back door, and "next thing you know everything just went to a loud noise and flashed, and there was my gun going off." Id. Appellant indicated he had loaded the shotgun before he left for work and he didn't remember "exactly how" he discharged the gun. Id. at 127. Appellant denied shooting the person solely because he was on Appellant's property; but rather, Appellant testified he "shot the person because [he] was threatening my life, my dog's life, and was forcing his way into my house by kicking the door." Id. at 129. Appellant noted he did not fire his shotgun until he heard someone else yell, "Shoot 'em." Id. Appellant claimed that, when he fired his gun, he was unaware the person at his door was a police officer and he did not notice the word "POLICE" on the back of the officer's jacket. Id. at 128. Appellant testified he did not realize he had shot a police officer until after he exited his house and Chief Bruneio so informed him. Appellant claimed he has no memory of opening the back door, putting down the shotgun, walking outside, or being handcuffed by Chief Bruneio. Id. at 130. Appellant denied joking that he was "on candid camera" when he was in the state police vehicle and, immediately after the shooting, he felt like it was a nightmare. Id. at 131.

On cross-examination, Appellant admitted he was angry after the verbal altercation with Mr. Clancy, and since they lived in a small town, Appellant knew Officer

Lasso prior to the day of the shooting. Id. at 143-44. Appellant admitted it was a sunny, summer day and, when Officer Lasso first arrived in his police cruiser and asked to speak to Appellant, he was not threatening towards Appellant. Appellant denied knowing the person who said, "Shoot 'em" was a police officer. Id. at 186. Appellant claimed to have no memory of the events occurring after his "firearm went off[,]" except he recalled that he was placed in two separate vehicles. Id. at 189. He denied that he said, "Hey, I'm on candid camera[,]" after he was placed in the state police vehicle, Id. at 194, and he denied making the following statements at the state police barracks to Trooper Brian C. Roberts:

> I don't understand. I have 10 puppies downstairs and I tell him to stay out of my fuckin' yard. Lucky he did not get fuckin' eaten. They are only three weeks old and I and my friends have gotten bit, and he is waving around a gun. Unreal. Fucking numb nuts. That's some fuckin' asshole threatening to kick my ass again. Somebody threatens to kick my ass, a cop sticks a gun in my face and then threatens to kill my dogs. Oh God, fuckin' city life sucks. I'm going back out in the woods. Fuckin' assholes.

Id. at 196-97.

In response to Appellant's denial that he made the aforementioned statements to Trooper Roberts, the Commonwealth confronted Appellant with his videotaped statement in which he made the precise statements at issue. Id. at 203-04. Upon viewing the videotaped statement, Appellant professed to have no recollection of making the statements.

Appellant further denied subsequently telling a fellow prison inmate, Benjamin Ruffing, that he argued with a neighbor, got "hyped up," and when a police officer appeared on the scene, he killed him. Id. at 210-11. He also denied telling Mr. Ruffing that he knew he was shooting at a police officer, that the "cop never saw it coming," or that he was intending to get in his pick-up truck and leave the scene when he was intercepted

by Chief Bruneio. Id. at 213-14. Appellant indicated he recalled speaking with a doctor after the shooting, and he informed her that he "peed in [his] pants" due to the stress. Id. at 214.

John Edward Stahr, Jr., a private investigator with twenty-five years of police service, testified he was hired by the defense to examine the pants, which Appellant had been wearing at the time of the shooting. His examination revealed bloodstains on the outside and stains that appeared to be from defecation in the inside. Id. at 225. Mr. Stahr admitted there was no indication from the police reports that Appellant had informed the officers on the scene he had defecated in his pants or that the officers observed any indication of such.

Chief Bruneio testified Appellant complained to the police about past thefts, including the theft of his four wheel all-terrain vehicle from his property on August 4, 2010, and the theft of a gun from his house on July 12, 2011. Andrew Hitcho, III, who is Appellant's cousin, testified he observed three males removing Appellant's four wheel all-terrain vehicle from his property, and he so informed Appellant, who became angry. Moreover, he confirmed someone broke into Appellant's home in July of 2011, and when Appellant told Andrew about the break-in, he was angry. In response to the crimes, Andrew installed a security system on Appellant's property. Additionally, Keith Hammerstone, who is also Appellant's cousin, confirmed Appellant was the victim of a break-in in July of 2011.

Trooper Dietz indicated he interviewed Chief Bruneio at 8:00 p.m. on the night of the shooting, and Chief Bruneio informed him that, when Officer Lasso was shot, "Officer Lasso had his taser removed from his holster and pointed at the dogs[.]" N.T. 5/16/12,

jury trial, at 43. Karen Hamm, who lives half a mile from Appellant, claimed she saw police cruisers responding to the scene and, when she went closer to Appellant's home, she saw Mr. Schaedel, who told her Officer Lasso "banged" on Appellant's door and attempted to enter prior to being shot. Id. at 45. On cross-examination, Ms. Hamm confirmed she was Appellant's friend, and she was aware Mr. Schaedel, who was also Appellant's friend, was charged in this case with making false reports to law enforcement officers.

Kelly Yerger testified she visited Appellant throughout the year, and his dogs were "sweet, loving dogs." Id. at 73. Her husband, Wayne Yerger, testified "they're great dogs." Id. at 95. Ashley A. Nagle, who is Appellant's daughter, confirmed Appellant had an attachment to his dogs.

Susan Elizabeth Rushing, Ph.D., an assistant professor at the University of Pennsylvania in the department of psychiatry, testified she evaluated Appellant at the prison on March 9, 2012, and she additionally examined forty-nine different records pertaining to Appellant. She noted Appellant had a history of repeated head injuries, had experienced a number of concussions, and carried a diagnosis of post-concussive syndrome. N.T. 5/17/12, jury trial, at 16.

Specifically, medical records indicated that, when Appellant was fifteen years old, another child punched him in the eye, resulting in Appellant being hospitalized at the Grand View Hospital with a fracture to his skull's orbital floor. Id. at 17. Additionally, in 1988, when Appellant was twenty-three years old, he was admitted to the hospital and diagnosed as suffering from a concussion as a result of a motorcycle accident. In 1993, Appellant was treated at the hospital for work-related back pain and a doctor's note,

which was dated September 10, 1993, indicated Appellant reported having suffered a fall from a bunk bed when he was a child.

In 2001, Appellant was examined at the South Bethlehem Family Practice, where he reported temper and impulse control difficulties. Dr. Rushing opined such problems can occur following a concussion. Id. at 19. In 2002, doctors prescribed Appellant Zoloft, which is an antidepressant medication commonly prescribed to people who have sustained a traumatic brain injury, in an effort to assist Appellant in controlling his mood instability.

Dr. Rushing further testified that, on June 24, 2004, Appellant was admitted to the hospital and diagnosed as suffering from another concussion following a second motorcycle accident. In 2005, Appellant was diagnosed with bipolar disorder, as well as paranoid personality. On September 5, 2007, Appellant was involved in a third motorcycle accident, admitted to the hospital's intensive care unit (ICU) for three days, and suffered a liver laceration and concussion. He was diagnosed as suffering from post-concussive syndrome, which results when a person's concussion symptoms do not improve. Dr. Rushing noted Appellant's medical records revealed Appellant reported to a physician's office on November 21, 2008, complaining of repeated episodes of fainting accompanied with amnesia, and Appellant had previously received counseling and medications related to his poor impulse control and anger issues.

During Dr. Rushing's examination of Appellant on March 9, 2012, he self-reported having suffered from ten separate head injuries, and he revealed to Dr. Rushing that, in the year prior to the shooting, he had been experiencing high levels of anxiety due, in part, to a number of thefts occurring in his neighborhood. Additionally,

following a break-in at his home, which occurred one month prior to the shooting, Appellant began to feel paranoid that someone was trying to kill him or steal his pedigree puppies. Id. at 23. He became nervous for the safety of the puppies and began sleeping in the basement near the puppies. Dr. Rushing opined that Appellant personified the animals. She testified Appellant relayed to her what memories he had regarding the day of the shooting, and in particular, he remembered feeling incredibly fearful for his and his dogs' safety.

Dr. Rushing opined that, based on the medical records and her examination of Appellant, Appellant suffered from mild cognitive impairment, which is pre-dementia, a generalized anxiety disorder, a major depressive disorder, and substance abuse in remission. Id. at 31. She further opined, to a reasonable degree of medical certainty, Appellant's brain damage decreased his ability to assess accurately the threat level on the day of the shooting and caused him extreme emotional disturbance. Id. at 32-33.

On cross-examination, Dr. Rushing admitted Appellant is neither delusional nor suffers from hallucinations, and he has the ability to form a specific intent to kill. However, she found that, on the day of the shooting, Appellant was acting under an extreme emotional state which impaired his judgment and increased his impulsivity. Dr. Rushing denied the existence of any evidence of intoxication on the day of the shooting.

Dr. Rushing admitted that a 2011 letter from the Grand View Hospital denied the existence of any hospital records for Appellant; however, Dr. Rushing testified she learned about the incident regarding another child punching Appellant from a file kept while Appellant was living at the New Boys Life Ranch. Id. at 52-53. Dr. Rushing acknowledged the hospital records from the 1988 motorcycle accident noted only a

"possible concussion" and did not note Appellant actually suffered a concussion. Id. at 69-70. Moreover, the September 10, 1993 doctor's note, which referenced Appellant's childhood fall out of a bunk bed, focused on Appellant's symptom of back pain and gave no indication Appellant injured his head when he fell from the bed.

Regarding the June 24, 2004 motorcycle accident, Dr. Rushing indicated on cross-examination that Appellant was admitted and discharged from the emergency room on the same day and alcohol intoxication was noted. She indicated the CT Scan of Appellant's head was negative, and she admitted Appellant's loss of consciousness after the motorcycle accident could have resulted from his intoxication as opposed to head trauma. Id. at 83. As for the September 5, 2007 motorcycle accident, Dr. Rushing admitted the hospital's ICU records revealed Appellant was not "amnestic" as to the accident and there was no diagnosis made by the hospital as to any head injury. Id. at 86. However, Dr. Rushing noted the hospital's discharge summary indicated Appellant was thrown from a motorcycle while not wearing a helmet, and for a physician that is a very significant indicator for a head injury. Id. at 86-87. Dr. Rushing admitted the treating physicians at the ICU did not diagnose a head injury or concussion resulting from the June 24, 2004 motorcycle accident, and a CT scan performed at this time showed no acute intracranial abnormality. However, Dr. Rushing noted a follow-up examination of Appellant by a physician on September 20, 2007, revealed the existence of a cerebral concussion and post-concussive syndrome. Id. at 91. She admitted an MRI of Appellant's brain performed in 2008 revealed no abnormalities. Id. at 110.

As for the break-in and theft of a gun from his home, Dr. Rushing noted Appellant suspected the person responsible was a woman who had previously resided with him and

the theft of his four wheel all-terrain vehicle occurred a year prior to the shooting. Dr. Rushing concluded it was a viable theory that Appellant shot Officer Lasso because he acted impulsively due to the stress from the previous break-ins, his fear of losing his dogs, and his head injuries. Id. at 105, 116-17.

The defense rested, and the Commonwealth presented rebuttal testimony from Troopers Sims and Roberts. Trooper Sims confirmed he drove Appellant to the state police barracks, and during the transport, he did not notice any fecal odors emanating from Appellant. Trooper Sims further testified on rebuttal about statements, which Appellant made to the police upon arrival at the police barracks. Specifically, Trooper Sims testified that, at approximately 6:50 p.m., he escorted Appellant to an interview room, and Appellant complained his ribs hurt. Trooper Sims told Appellant to "sit tight, the criminal investigator would be in shortly to get him checked out, just sit quietly and they will be in shortly." N.T. 5/17/12, jury trial, at 122. Appellant replied, "I will talk. I told him to get off my property. He ain't [sic] coming on my property without a warrant. He tried to kill my dogs and pointed a gun in my face. I don't care if they're [sic] a cop or not, unbelievable." Id. at 123.

Trooper Roberts testified on rebuttal that, at approximately 9:20 p.m., he read Appellant his Miranda[7] rights, and after Appellant initially stated he did not wish to speak about the incident, Trooper Roberts informed Appellant that, if he needed anything or wished to speak with him, he should so notify a patrol officer. As Trooper Roberts was preparing to leave the interview room, Appellant stated:

---

[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

> The only thing I need to know is what's going on with my dogs because a police officer threatened to kill them, and I need to know what happened to them because all I did was black out, and when I woke up he was on the ground and he had a gun pointed at me first and then the dogs second, and the last thing--and I don't remember anything else--I just want to know what's going on with my dogs.

N.T. 5/17/12, jury trial, at 126. Appellant further stated, "Everything would have been fine if he did not point a gun at me and the dogs." Id. at 127. Appellant told Trooper Roberts, "Thank God my dogs are all right. Thank God. I can lose everything else in my life, but you're not taking my dogs, the only thing that I have left in my fuckin' name." Id. at 128. Trooper Roberts denied Appellant complained of having soiled himself in any fashion.

At the close of trial, the jury found Appellant guilty of first degree murder, and since the Commonwealth was seeking the death penalty, the jury remained empanelled for a separate penalty phase hearing. On May 24, 2012, after hearing additional testimony, argument from both the defense counsel and prosecutor, and instructions from the trial court, the same jury unanimously found one aggravating circumstance: The victim was a peace officer or local law enforcement official who was killed in the performance of his duties. See 42 Pa.C.S. § 9711(d)(1). One or more jurors also found three mitigating circumstances: (1) Appellant has no significant history of prior criminal convictions; (2) Appellant was under the influence of extreme mental or emotional disturbance; and (3) The capacity of Appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. See 42 Pa.C.S. § 9711(e)(1), (2), (3). However, the jury unanimously further found the aggravating circumstance outweighed the three mitigating circumstances, and consequently, the jury sentenced Appellant to death. See 42 Pa.C.S. § 9711(c)(1)(iv).

Thereafter, Appellant filed a timely post-sentence motion, which the trial court denied. Appellant timely appealed to this Court and timely filed a court-ordered concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925.

## I. Sufficiency of the Evidence for First Degree Murder Conviction

Although not specifically challenged by Appellant, we begin by independently reviewing the evidence to ensure that it is sufficient to support his conviction for first degree murder. Commonwealth v. Zettlemoyer, 500 Pa. 16, 454 A.2d 937 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444 (1983) (providing that, in all cases in which the death penalty is imposed, it is this Court's duty to undertake a review of the sufficiency of the evidence). Because evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. Commonwealth v. Sanchez, 614 Pa. 1, 36 A.3d 24 (2011), cert. denied, 133 S.Ct. 122 (2012). In reviewing the sufficiency of the evidence, "we must decide whether the evidence admitted at trial, and all reasonable inferences drawn therefrom in favor of the Commonwealth, as verdict winner, support the jury's finding of all the elements of the offense beyond a reasonable doubt." Commonwealth v. Mitchell, 588 Pa. 19, 42, 902 A.2d 430, 444 (2006), cert. denied, 549 U.S. 1169, 127 S.Ct. 1126 (2007) (citation omitted).

To sustain a conviction for murder of the first degree, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and specific intent to kill. See 18 Pa.C.S. § 2502(a). At trial, the only disputed element was whether Appellant had the requisite malice and intent to kill. For first degree murder, an intentional killing is a "killing

by means of poison or by lying in wait, or any other kind of willful, deliberate, and premeditated killing." 18 Pa.C.S. § 2502(d). We are cognizant that "the period of reflection required for premeditation to establish the specific intent to kill may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." Commonwealth v. Rivera, 603 Pa. 340, 354, 983 A.2d 1211, 1220 (2009), cert. denied, 560 U.S. 909, 130 S.Ct. 3282 (2010) (quotation and quotation marks omitted). Moreover, the finder of fact may infer malice and specific intent to kill based on the defendant's use of a deadly weapon on a vital part of the victim's body. Commonwealth v. Arrington, ___ Pa. ___, 86 A.3d 831, 840 (2014), cert. denied, 135 S.Ct. 479 (2014).

We find the Commonwealth provided sufficient evidence to prove each element of first degree murder beyond a reasonable doubt. Specifically, it is undisputed that, following Appellant's late afternoon verbal altercation with a neighbor, Officer Lasso arrived on the scene in response to a 911 call. As Officer Lasso, who was in full uniform with his gun holstered, stood with his back towards Appellant's residence's closed door, and attempted to fend off two snarling dogs, Appellant used a shotgun to shoot him in the back of the head, which forensic testimony established is a vital part of the human body. Forensic testimony further established Officer Lasso's wound was not survivable and he died within seconds of being shot. The record evidence suggests a presence of mind belying Appellant's contentions he lacked specific intent. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to support a finding Officer Lasso was unlawfully killed, Appellant killed him, and he acted

with malice and specific intent to kill. We now proceed to address the claims raised by Appellant.

## II. Denial of Motion in Limine to Exclude Firearms

Appellant first claims the trial court erred in denying his pre-trial motion in limine seeking the exclusion of evidence related to four guns, which were lawfully seized by the police from Appellant's residence immediately after the shooting but not utilized in the commission of the crime.[8] Specifically, citing to Commonwealth v. Robinson, 554 Pa. 293, 721 A.2d 344 (1998), cert. denied, 528 U.S. 1082, 120 S.Ct. 804 (2000), and Commonwealth v. Lee, 541 Pa. 260, 662 A.2d 645 (1995), cert. denied, 517 U.S. 1211, 116 S.Ct. 1831 (1996), Appellant argues any evidence of the four firearms should have been excluded solely on the basis the weapons were undisputedly not the murder weapon. Moreover, he suggests that, even if the four firearms were not subject to a blanket exclusion on this basis, evidence of the four firearms was otherwise irrelevant and highly prejudicial.

The Commonwealth admits the evidence reveals Appellant did not utilize any of the four guns at issue in killing Officer Lasso and, instead, he used a specific 12-gauge shotgun, which Chief Bruneio seized outside of Appellant's residence immediately after the shooting. However, the Commonwealth contends the trial court properly concluded evidence of the four guns was admissible to show Appellant had the specific intent to kill in that, although Appellant had an array of weapons at his disposal, he chose to utilize a

---

[8] The four guns at issue include a Marlin 30-30 rifle, a Ruger M77 rifle, a Winchester M94 rifle, and a Rossi .38 caliber revolver. Appellant additionally includes a Mossberg 12-gauge shotgun in his list of challenged firearms; however, the record confirms the trial court excluded evidence related to this specific firearm. N.T. 5/11/12, pretrial, at 138.

12-gauge shotgun, which would be likely to inflict more damage, when he shot Officer Lasso. Alternatively, the Commonwealth contends evidence of the four guns was admissible to demonstrate Appellant's familiarity with weapons and, thus, negate his claim that he mistook the taser gun, which Officer Lasso was holding, for a handgun.

Initially, we note that, "[w]hen reviewing the denial of a motion in limine, we apply an evidentiary abuse of discretion standard of review." Mitchell, 588 Pa. at 60, 902 A.2d at 455 (2006) (citation omitted). Thus, we review the denial of the motion for an abuse of discretion. Id. "In general, relevant evidence, i.e., evidence that logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable[,] or supports a reasonable inference or presumption regarding a material fact, is admissible." Commonwealth v. Jordan, 619 Pa. 513, 524-25, 65 A.3d 318, 324 (2013), cert. denied, 134 S.Ct. 1275 (2014) (quotation and quotation marks omitted). See Commonwealth v. Patterson, ___ Pa. ___, 91 A.3d 55 (2014). However, although a court may find that evidence is relevant, the court may nevertheless exclude the evidence if its probative value is outweighed by the likelihood of unfair prejudice. Commonwealth v. Reid, 571 Pa. 1, 34, 811 A.2d 530, 550 (2002), cert. denied, 540 U.S. 850, 124 S.Ct. 131 (2003) (citation omitted). Thus, in exercising its discretion, the trial court must balance the evidentiary value of the evidence against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury. See Jordan, supra.

In the instant case, however, we need not resolve the issue of whether the trial court abused its discretion in denying Appellant's motion in limine, thus permitting the Commonwealth to introduce evidence of the four guns. Assuming, arguendo, the trial

court erred, given the overwhelming evidence establishing first-degree murder, we find any error to be harmless, and thus not warranting relief. Commonwealth v. Ballard, 622 Pa. 177, 207-08, 80 A.3d 380, 399-400 (2013), cert. denied, 134 S.Ct. 2842 (2014) ("Harmless error exists where…[,inter alia,] the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.") (quotation and citation omitted)).

Specifically, in this regard, the evidence demonstrates that Appellant shot a uniformed police officer in the back of the head from a distance of five feet with a shotgun. The shooting occurred immediately after Appellant had an aggressive confrontation with a neighbor during which time Appellant was in possession of a makeshift weapon. N.T. 5/14/12, jury trial, at 81, 90, 96, 107, 117-19. Furthermore, unchallenged testimony established that the police seized from Appellant's dining room another makeshift weapon (a baseball bat with protruding spikes), N.T. 5/15/12, jury trial, at 42, and testimony from Dr. Rushing set forth Appellant's lack of control over his temper, although he was found to be legally competent to be tried and held accountable for his actions. N.T. 5/17/12, jury trial, at 19, 26-27, 32, 103-04. Additionally, while Appellant offered an explanation for his actions to the jury, his testimony was fraught with inconsistencies and based on an unbelievable version of events wherein Appellant related that he believed an unknown intruder was attempting to break into his back door, even though he knew Officer Lasso, with whom he was acquainted, was in the back of his house waiting to speak with him. N.T. 5/16/12, jury trial, at 113, 119-25, 143-44, 148-49, 167.

In sum, the circumstances surrounding the shooting, Appellant's unbelievable explanation, the evidence establishing Appellant's propensity towards violence, and the weakness of Appellant's defense, which was premised on his inability to manage his anger and emotions, leads to the conclusion that any error in the trial court's admission of the four guns was harmless. See Ballard, supra. Thus, Appellant's claim fails.

### III. Admission of "Candid Camera" Statement at Guilt Phase

Appellant next maintains the trial court erred in permitting Trooper Kelly to testify, over defense counsel's objection, that, while Appellant was detained in the back seat of the state police cruiser and subject to video surveillance, Appellant spontaneously stated, "Hey, I'm on Candid Camera." N.T. 5/14/12, jury trial, at 314. See id. at 305-06 (defense counsel objecting to Trooper Kelly offering such testimony and the trial court overruling the objection). Appellant contends evidence of the statement was irrelevant and, to the extent such could be found relevant, its relevance was outweighed by its undue prejudice. In this regard, Appellant suggests the statement unfairly depicted him as "callous and indifferent about the death of Officer Lasso…[and] served no purpose other than to inflame the jury and prejudice them against [Appellant]." Appellant's Brief at 19.

The trial court held the statement at issue was relevant since it was probative of Appellant's state of mind when he shot Officer Lasso. The trial court highlighted "[t]he cavalier, nonchalant quality of [Appellant's] statement, which was made at the crime scene shortly after the shooting, bespoke a certain cold-bloodedness and thereby undermined [Appellant's] contention that he killed Officer Lasso in the heat of passion or in an unjustified belief that he was acting in self-defense." Trial Court Opinion dated

11/27/13 at 52-53.   The trial court further determined the probative value of the evidence outweighed its prejudicial effect.   Id. at 53.

We conclude the trial court did not err in this regard.   In this capital case, Appellant admitted at trial he shot Officer Lasso and his defense was centered on his alleged lack of specific intent to kill.   Appellant's actions, statements, and demeanor before, during, and after the commission of the shooting are generally relevant to show his state of mind. See Commonwealth v. Reid, ___ Pa. ___, 99 A.3d 470 (2014); Commonwealth v. Murphy, 493 Pa. 35, 425 A.2d 352 (1981) (indicating evidence of an appellant's statements and conduct at a time and place close to the commission of the crime for which he is charged is admissible if relevant to show a defendant's mental state when he committed the charged crimes).

Here, Appellant made his spontaneous "candid camera" statement within an hour and a half after he shot Officer Lasso, in the presence of other police officers, and as he was about to be transported to the police station.   We agree with the trial court that the statement, made under such circumstances as to demonstrate Appellant was in a "joking mood" shortly after having just shot a police officer, was relevant to show he did so with malice and specific intent and undermined his attempts to reduce his level of culpability. The evidence did not impugn Appellant's character, nor was it unduly prejudicial. Commonwealth v. Towles, ___ Pa. ___, 106 A.3d 591, 603 (2014).   Accordingly, the trial court did not err in admitting this evidence.

## IV.  Limiting of Defense's Cross-Examination of Trooper Roberts

Appellant next argues that, during the guilt phase, the trial court improperly limited defense counsel's cross-examination of the lead police investigator, Trooper Roberts,

thus prohibiting defense counsel from eliciting testimony about out-of-court statements, which Appellant made at the police station. Appellant contends that, by asking Trooper Roberts on direct examination to "outline his investigation," the Commonwealth "opened the door" for defense counsel to "elicit [on cross] the statements [Appellant] made when interviews of [Appellant] were conducted by Trooper Sims and Trooper Roberts."[9] Appellant's Brief at 20-21.

A review of the pertinent portion of the trial notes of testimony reveal that, at the guilt phase on May 15, 2012, the Commonwealth presented during its case-in-chief the testimony of Trooper Roberts, who testified, inter alia, that, as the lead investigator, he assigned investigators to interview the witnesses, accumulated the physical evidence, marshalled the evidence into a completed report, and filed the criminal charge against Appellant. N.T. 5/15/12, jury trial, at 14-18.

On cross-examination, defense counsel showed Trooper Roberts the criminal complaint and affidavit of probable cause. Id. at 21-22. The following relevant exchange then occurred:

**[DEFENSE COUNSEL]:** Everything is true and correct in that affidavit?

---

[9] Appellant's out-of-court statements at issue are as follows: (1) "I will talk. I told him to get off my property. He ain't [sic] coming on my property without a warrant. He tried to kill my dogs and pointed a gun in my face. I don't care if you're a cop or not, unbelievable." N.T. 5/15/12, jury trial, at 178; (2) "The only thing I need to know is what's going on with my dogs because a police officer threatened to kill them, and I need to know what happened to them because all I did was black out, and when I woke up he was on the ground and he had a gun pointed at me first and then the dogs second and the last thing--and I don't remember anything else--I just want to know what's going on with my dogs." Id. at 180; (3) "[E]verything would have been fine if he did not point the gun at me and the dogs." Id. at 180; and (4) "Thank God my dogs are all right. Thank God. I can lose everything else in my life, but you're not taking my dogs, the only thing I have left in my fucking name[.]" Id. at 181.

[TROOPER ROBERTS]: Yes, it is.

[DEFENSE COUNSEL]: Can you look at paragraph two, and can you read that affidavit?

[THE PROSECUTOR]: Objection, your honor. May we approach?

(The following discussion was held at sidebar.)

THE COURT: What is your objection?

[THE PROSECUTOR]: I'd like an offer of proof. What's going on? It's beyond the scope of my direct, number one.

THE COURT: What is the question?

[DEFENSE COUNSEL]: Number one, I asked him if he filed a criminal complaint, and he said yes. I simply want to put in as fact that when the victim was shot the taser was pointed at the dogs. It's in his affidavit of probable cause. It's his signed statement.

[THE PROSECUTOR]: He can bring this out on his side of the case.

THE COURT: I will allow the question.

[DEFENSE COUNSEL]: The officer said he does interviews. I was going to elicit additional statements by [Appellant] because he testified on direct.

THE COURT: What statements?

[DEFENSE COUNSEL]: Some other statements from [Appellant], because he indicated on direct that it was part of his investigation that he does interviews.

THE COURT: Is that part of his procedure?

[DEFENSE COUNSEL]: It would be.

THE COURT: I'll let you go with this.

[DEFENSE COUNSEL]: I'll do this now, and I'll call him on my side of the case.

(End of discussion at sidebar.)

[DEFENSE COUNSEL]: Officer, could you read paragraph two of the affidavit of probable cause?

[TROOPER ROBERTS]: Upon arrival, Bruneio observed Officer Lasso being attacked by two dogs. Bruneio observed Lasso with his electronic immobilization device, taser, pointed at the dogs. Bruneio directed Lasso to shoot the dogs. At that point Bruneio heard a loud pop and observed Officer Lasso fall to the ground.

[DEFENSE COUNSEL]: And the taser is--when you say the immobilization device, is that the taser?

[TROOPER ROBERTS]: Yes.

[DEFENSE COUNSEL]: That would be the exhibit--I believe it is--the exhibit that was presented, the taser?

[TROOPER ROBERTS]: Yes.

THE COURT: For the record, that's C-10.

[DEFENSE COUNSEL]: So when you filed charges against [Appellant], what you put in the affidavit of probable cause at the time of the shooting, the taser was pointed at the dogs, is that correct?

**[TROOPER ROBERTS]:** That was the information provided to me at that time.
**[DEFENSE COUNSEL]:** Nothing further.
**[PROSECUTOR]:** Nothing further, your honor.
**THE COURT:** All right. Trooper, you may step down.

Id. at 22-25.

Contrary to Appellant's averment, there is no indication from the record the trial court prevented defense counsel from cross-examining or eliciting testimony from Trooper Roberts regarding statements Appellant made at the police station. In fact, when defense counsel initially proffered that he intended to cross-examine Trooper Roberts in this manner, the trial court ruled, "I'll let you go with this." Id. at 23. However, defense counsel then altered his course of action, indicating he would cross-examine Trooper Roberts about Chief Bruneio's statements concerning the taser, which were included in the affidavit of probable cause, and he would then later recall Trooper Roberts on direct examination to ask him questions about the statements, which Appellant made to the troopers. Id. at 23-24. Appellant's mischaracterization of the record notwithstanding, we conclude the trial court did not limit Appellant's cross-examination of Trooper Roberts in the manner averred by Appellant.

In any event, as further discussed infra, the jury was made aware of Appellant's statements at issue via the testimony of Troopers Sims and Roberts, who testified as Commonwealth rebuttal witnesses and confirmed Appellant made each of the out-of-court statements at issue. See N.T. 5/17/12 at 123, 127-28.

### V. Limiting of Defense's Direct Examination of Trooper Roberts[10]

---

[10] Appellant presents two separate argument sections, Claims D and E, related to the trial court's ruling, which pertained to defense counsel's direct examination of Trooper (continued…)

Appellant next argues that, during the guilt phase, the trial court improperly limited defense counsel's direct examination of Trooper Roberts, thus improperly prohibiting defense counsel, a second time, from eliciting testimony regarding the out-of-court statements, as referenced infra in footnote eleven, which Appellant made at the police station. In this regard, Appellant contends the trial court erred in ruling Appellant's out-of-court statements constituted inadmissible hearsay and/or his statements were inadmissible pursuant to Pennsylvania Rule of Evidence 106.[11] Appellant avers he was prejudiced by the trial court's ruling since it precluded the jury from considering his out-of-court statements at issue, which supported his defense theories. Alternatively, Appellant suggests the trial court's ruling improperly forced him to testify as a condition precedent to defense counsel eliciting testimony about the statements from Trooper Roberts on direct examination.

In order to place Appellant's current claim in context, we note the following: As indicated supra, during the cross-examination of Trooper Roberts, defense counsel declined to ask the trooper questions about Appellant's statements, which Appellant made at the police station, and instead, defense counsel informed the trial court he planned to recall Trooper Roberts on direct examination to elicit the statements. See

---

(…continued)
Roberts. See Appellant's Brief at 21-37. However, as the arguments are inextricably intertwined, we shall address them together.

[11] Pa.R.E.106 provides the following: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time."

N.T. 5/15/12, jury trial, at 23-24.  Thereafter, immediately after the Commonwealth rested its case-in-chief, the Commonwealth made an oral motion in limine seeking to preclude defense counsel from eliciting testimony on direct examination of Trooper Roberts concerning the aforementioned statements.  N.T. 5/15/12, jury trial, at 107-08. The Commonwealth argued that, in the event Appellant did not testify, and thus was not subject to cross-examination, any attempt to have his self-serving out-of-court statements and version of events presented to the jury via defense counsel's direct examination of Trooper Roberts would be impermissible.  See id. at 108.  Following argument from the parties, the trial court granted the Commonwealth's oral motion in limine as to the specific statements set forth in footnote eleven, supra.  See id. at 178-81.

Subsequently, Appellant testified and defense counsel did not question Appellant as to whether he made the out-of-court statements at issue.  However, on cross-examination of Appellant, the prosecutor asked Appellant whether he remembered making his out-of-court statements, and Appellant testified he had no memory of making them.[12]  See N.T. 5/16/12, jury trial, at 195-97.  Defense counsel then called Trooper Roberts to testify on direct examination; however, despite the fact Appellant had testified in accordance with the trial court's ruling, defense counsel did not attempt to elicit any

---

[12] For clarification, Appellant testified he "probably" made the following statement to Trooper Roberts:

> The only thing I need to know is what's going on with my dogs because a police officer threatened to kill them and I need to know what happened to them because all I did was black out, and when I woke up he was on the ground, he had a gun pointed at me first, and then the dogs second, and the last thing--and I don't remember anything else--I just want to know what's going on with my dogs[.]

N.T. 5/16/12, jury trial, at 195-96.  He testified he did not remember making the remaining statements.

testimony from Trooper Roberts concerning the statements Appellant made to the troopers at the police station.

Thereafter, the Commonwealth called Troopers Sims and Roberts as rebuttal witnesses, and they confirmed Appellant made each of the out-of-court statements at issue. See N.T. 5/17/12, jury trial, at 123, 127-28.

Assuming, arguendo, the trial court erred in granting the Commonwealth's motion in limine, we agree with the Commonwealth that such error was harmless. See Mitchell, supra (holding that an erroneous ruling on an evidentiary issues does not require us to grant relief where the error is harmless). As indicated supra, the trial court's ruling prohibited defense counsel from eliciting, in the absence of Appellant testifying, testimony from Trooper Roberts on direct examination regarding Appellant's out-of-court statements at issue. Thereafter, despite the fact Appellant testified, and then subsequently called Trooper Roberts to testify during the defense's case-in-chief, defense counsel did not attempt to elicit testimony from the trooper concerning the statements. Thus, although Appellant now baldly suggests, without citation to authority, he was prejudiced since the trial court's ruling "forced [him] to testify and be exposed to cross examination," see Appellant's Brief at 37, the record belies this contention. That is, Appellant cannot complain he was "forced" to testify so as not to lose the opportunity to elicit the desired testimony from Trooper Roberts, when, after Appellant testified, he did not seek to elicit such testimony from the trooper on direct examination. Moreover, as discussed supra, evidence of Appellant's out-of-court statements was, in fact, presented to the jury via the rebuttal testimony of Troopers Sims and Roberts. For these reasons, we are convinced any prejudice suffered by Appellant as a result of the trial court's

granting of the Commonwealth's motion in limine was de minimis.[13]   See Commonwealth v. Hairston, ___ Pa. ___, 84 A.3d 657, 671-72 (2014), cert. denied, 135 S.Ct. 164 (2014) (indicating harmless error exists if the record demonstrates the error did not prejudice Appellant or the prejudice was de minimis).

## VI. Passion, Prejudice, and Arbitrariness Review of Death Sentence

The death penalty statute requires this Court to conduct an independent penalty review pursuant to 42 Pa.C.S. § 9711(h)(3).  Commonwealth v. Martin, ___ Pa. ___, 101 A.3d 706, 732 (2014).   Section 9711(h)(3) provides that "[t]he Supreme Court shall affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." 42 Pa.C.S. § 9711(h)(3).   Invoking this statutory provision, Appellant claims the jury's death sentence was the product of passion, prejudice or some other arbitrary factor, and therefore, he is entitled to a new sentencing hearing.   Appellant argues it is apparent the jury relied on passion, prejudice or some other arbitrary factor since, despite the fact "one or more jurors concluded [Appellant] was suffering from a mental or emotional disturbance and could not appreciate the criminality of his conduct or conform his conduct to the requirements of the law[,]" see Appellant's Brief at 37, the jury still sentenced him to death.   Appellant suggests that, in finding these two mitigating factors existed, the jury must have necessarily accepted the testimony of the defense's mitigation experts, Dr.

___

[13] To the extent Appellant suggests the defense's direct examination of Trooper Sims was similarly improperly limited by the trial court's ruling, we note that, despite the fact Appellant testified, he never called Trooper Sims as a witness during the defense's case-in-chief.  Thus, similar to Appellant's allegation of prejudice as it pertains to the defense's direct examination of Trooper Roberts, Appellant is not entitled to relief.

Rushing and Dr. Gerald Cooke,[14] as providing an accurate assessment of Appellant's mental state at the time of the shooting. Appellant further suggests the jury necessarily accepted additional mitigation evidence, including the fact Appellant was "so paranoid" he had a security system installed and the shooting occurred during a "volatile situation" where Appellant did not discharge his weapon until Chief Bruneio commanded, "Shoot 'em." See Appellant's Brief at 41-43. Appellant avers that, since the jury found just one aggravating circumstance,[15] but seemingly accepted all of his mitigation evidence in finding the two mitigating circumstances set forth supra, as well as a third mitigating factor related to his lack of significant prior criminal convictions, the only logical explanation is the jury's death sentence was an "emotional decision," which was the product of passion, prejudice or some other arbitrary factor.

Initially, we note that, in presenting his argument, Appellant has developed a substantial account of the factual record, and recounted the evidence he submitted in mitigation, for our review; however, he has failed to develop a legal argument that would

---

[14] Dr. Rushing testified at the penalty phase regarding, inter alia, Appellant's history of brain injuries, drug use, and chronic pain. Dr. Cooke, a forensic psychologist, testified about, inter alia, Appellant's history of amnesia and concussions. He opined, to a reasonable degree of psychological certainty, that Appellant suffers from cognitive disorders, which are an extreme mental or emotional disturbance. N.T. 5/23/12, sentencing hearing, at 38.

[15] As the Commonwealth notes, during the penalty phase, Appellant conceded the existence of the aggravating circumstance at issue, i.e., the victim was a peace officer or local law enforcement official who was killed in the performance of his duties. See N.T. 5/21/12, sentencing hearing, at 50.

warrant us setting aside the jury's finding.[16]   In any event, as the trial court noted in its opinion, Appellant's "argument on this issue is, effectively, a challenge to the jury's weighing of the three mitigating circumstances found to exist against the single aggravating circumstance."   Trial Court Opinion dated 11/27/13 at 81.   This Court has previously reaffirmed that the weighing process is exclusively a question for the finder of fact, the language of 42 Pa.C.S. § 9711(h)(3) does not create an obligation for this Court to reweigh the evidence, and we "may not reverse a death penalty on weight of the evidence grounds."   Ballard, 622 Pa. at 230, 80 A.3d at 412 (citing Commonwealth v. Reyes, 600 Pa. 45, 963 A.2d 436, 441-42 (2009), cert denied, 558 U.S. 850, 130 S.Ct. 127 (2009)).

> [T]there is no mechanism by which a sentence of death may be reversed by this Court on the basis of an improper weighing of aggravating and mitigating circumstances because our authority to vacate a sentence is prescribed by 42 Pa.C.S. § 9711(h)(3), which requires us to affirm the sentence of death unless: "(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)."   Id.
> "[T]his restriction on our authority has caused this Court to reiterate many times that it is exclusively the function of the jury in the first instance to decide whether aggravating and mitigating circumstances exist and then whether the aggravating circumstances outweigh any mitigating circumstances."   Reyes, 963 A.2d at 441.

Commonwealth v. Diamond, ___ Pa. ___, ___, 83 A.3d 119, 135 (2013), cert. denied, 135 S.Ct. 145 (2014).

---

[16] In fact, aside from citing to Commonwealth v. Dick, 602 Pa. 180, 978 A.2d 956 (2009), cert. denied, 559 U.S. 1072, 130 S.Ct. 2098 (2010), for the general proposition that this Court must conduct an independent penalty review pursuant to 42 Pa.C.S. § 9711(h)(3), Appellant has failed to cite case law supporting his argument.

Although this Court is not privy to the jury's deliberation, the fact the jury concluded the aggravating circumstance outweighed any mitigating circumstances does not render its verdict the "product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3)(i)). We cannot set aside the jury's verdict based upon speculation that the jury did not do its duty. Moreover, it does not follow that, since one or more jurors found the existence of the three mitigating circumstances at issue, the jury necessarily "accepted" all of the mitigation evidence set forth by Appellant. Rather, the jury was free to believe all, part, or none of the evidence presented. See Diamond, supra.

## VII. Death Sentence Against the Weight of the Evidence

Appellant next avers generally that "his death sentence was against the weight of the evidence."[17] Appellant's Brief at 44 (footnote omitted). Appellant recognizes that, under our existing jurisprudence, claims regarding weight of the evidence are not available to challenge a death sentence. See Appellant's Brief at 44 n.16 (citing Ballard, supra). See also Diamond, supra; Reyes, supra. However, he notes he is raising a weight of the evidence claim for preservation purposes. See Appellant's Brief at 44 n.16. As our precedent makes it clear that claims regarding weight of the evidence are not available to challenge a death sentence, and Appellant offers no basis for us to depart therefrom, we find this claim to be unavailing.

---

[17] Appellant fails to recognize his previous argument in which he attempted to invoke our statutory obligation under Section 9711(h)(3) was effectively a challenge to the weight of the evidence for his death sentence. In Ballard, supra, we specifically rejected the notion that our review under Section 9711(h)(3) for passion, prejudice or other arbitrary factors is a mandate to review the weight of the evidence.

## VIII.   Jury Instructions at Penalty Phase[18]

Appellant next claims the trial court abused its discretion in denying three of his proposed points for charge at the penalty phase.   Specifically, Appellant contends the trial court erred in failing to give the following three proposed jury instructions:

### A. Life Without the Possibility of Parole

> Under Pennsylvania law, a person who has been convicted of first degree murder must be sentenced to one of two possible sentences; death or life in prison without the possibility of parole.   In Pennsylvania, a sentence of life in prison without the possibility of parole means just that.   A person convicted of first-degree murder is not eligible for parole.   If sentenced to life in prison without the possibility of parole, Defendant will die in prison.

N.T. 5/23/12, sentencing hearing, at 171-72; Appellant's Penalty Phase Points for Charge No. 1; Trial Court Opinion dated 11/27/13 at 94-95.

### B. Presumption of Life Imprisonment in Capital Cases

> There is a presumption of life imprisonment in this case.   The Commonwealth bears a heavier burden to show aggravating factors beyond a reasonable doubt while factors in mitigation need only be proven by a mere preponderance of the evidence.   Life has intrinsic value and should not be taken by the Commonwealth without good cause, proven to our highest standard, whereas life imprisonment remains our default punishment for capital cases.

N.T. 5/23/12, sentencing hearing, at 172-73; Appellant's Penalty Phase Points for Charge No. 3; Trial Court Opinion dated 11/27/13 at 96.

### C. Death Sentence Never Required

> A jury is never required to impose a death sentence and a sentence of death cannot be imposed except by unanimous vote.

---

[18] Appellant presents three claims (Claims H, I, and J) pertaining to the trial court's jury instructions at the penalty phase.   For the sake of clarity, we shall address the claims under one heading.

N.T. 5/23/12, sentencing hearing, at 175; Appellant's Penalty Phase Points for Charge No. 10; Trial Court Opinion dated 11/27/13 at 97-98.

Initially, we note that "[i]t is a bedrock appellate principle that 'issues not raised in the lower court are waived and cannot be raised for the first time on appeal.' 'A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of.'" Commonwealth v. Sanchez, ___ Pa. ___, 82 A.3d 943, 978 (2013), cert. denied, 135 S.Ct. 154 (2014) (quotations omitted). Moreover, this Court has held, in the criminal trial context, "the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to the charge or the trial court's ruling respecting the points." Commonwealth v. Pressley, 584 Pa. 624, 632, 887 A.2d 220, 225 (2005) (footnote omitted).

Our review of the record confirms that, prior to the parties' closing arguments, the trial court conducted an on-the-record charging conference in chambers at which it denied Appellant's proposed points for charge at issue. N.T. 5/23/12, sentencing hearing, at 171-75. Defense counsel did not object or take exception to the trial court's rulings. In fact, in denying Appellant's first and second proposed instructions at issue, the trial court indicated it planned to use the standard charges, and defense counsel responded, "That's fine" and "Okay." Id. at 172-73. In denying Appellant's third proposed instruction at issue, the trial court indicated it was going to give the standard instruction, and defense counsel remained silent. Id. at 175. Additionally, at the conclusion of the charging conference, the trial court inquired as to whether the parties

had "anything else on the jury instructions[,]" and defense counsel replied, "No." Id. at 175-76. Moreover, following the jury charge, Appellant failed to object to the instruction or take exception to it before the jury retired to deliberate. Indeed, the trial court inquired of counsel whether there were any objections to the charge as given, and defense counsel replied, "None, your honor." N.T. 5/24/12, sentencing hearing, at 114.

As is evident, Appellant made no specific objection or exception to the charge or the trial court's rulings respecting the points. See Pressley, supra. This Court abolished the relaxed waiver doctrine in capital direct appeals filed after the date of our decision in Commonwealth v. Freeman, 573 Pa. 532, 827 A.2d 385 (2003), cert. denied, 543 U.S. 822, 125 S.Ct. 30 (2004). Thus, Appellant's challenges to the trial court's death penalty instruction have been waived on direct appeal.

## IX. Constitutionality of Pennsylvania's Death Penalty Statute

Appellant next presents two constitutional challenges to Pennsylvania's capital sentencing statute. We note:

> A presumption exists "[t]hat the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth" when promulgating legislation. 1 Pa.C.S. § 1922(3). Duly enacted legislation is presumed valid, and unless it clearly, palpably and plainly violates the Constitution, it will not be declared unconstitutional. Commonwealth v. Davidson, 595 Pa. 1, 938 A.2d 198, 207 (2007). Accordingly, the party challenging the constitutionality of a statute bears a heavy burden of persuasion. Id.

Commonwealth v. Baker, 621 Pa. 401, 411, 78 A.3d 1044, 1050 (2013).

### A. Burden of Proof Regarding Mitigating Factors

Appellant first presents a broad claim that the capital sentencing statute requiring the defendant to prove mitigating circumstances by a preponderance of the evidence, 42

Pa.C.S. § 9711(c)(1)(iii), is unconstitutional.[19] According to Appellant, Section 9711(c)(1)(iii) creates an impermissible "burden of proof" barrier to individualized sentencing, which is not imposed upon defendants in non-capital sentencing schemes, and improperly serves to expand the circumstances under which the penalty of death may be imposed.

Initially, we note the United States Supreme Court has held that, to pass constitutional muster, States must satisfy the requirement of individualized sentencing by permitting capital juries "to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." Blystone v. Pennsylvania, 494 U.S. 299, 304-05, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990) (quotation and quotation marks omitted). A State's death penalty statute "cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty." Blystone, 494 U.S. at 309, 110 S.Ct. at 1084 (quotation and quotation marks omitted). The High Court has specifically held that Pennsylvania's death penalty statute satisfies these constitutional requirements. See id.

Moreover, Appellant's constitutional claim involves arguments, which this Court has previously considered and rejected. See Commonwealth v. Walker, 540 Pa. 80, 101, 656 A.2d 90, 101 (1995), cert. denied, 516 U.S. 854, 116 S.Ct. 156 (1995) (holding death penalty statute does not violate due process clause by placing the burden of proving the mitigating circumstances upon the accused); Commonwealth v. O'Shea, 523

---

[19] Appellant grounds his claim in his rights to due process, equal protection, and freedom from cruel and unusual punishment. However, he fails to develop a specific argument under the provisions.

Pa. 384, 567 A.2d 1023 (1990), <u>cert. denied</u>, 498 U.S. 881, 111 S.Ct. 225 (1990) (rejecting claim that placing the burden of proof on the defendant to prove mitigating circumstances by a preponderance of the evidence is unconstitutional and invalidates the sentencing process); <u>Zettlemoyer</u>, <u>supra</u> (holding Section 9711 does not violate a defendant's due process protections by placing on the defendant the burden of proving, by a preponderance of the evidence, the existence of mitigating circumstances).   As this Court held in <u>Zettlemoyer</u>:

> [T]he Commonwealth must prove every element necessary to establish murder of the first degree and every element necessary to establish one or more aggravating circumstance which the legislature has determined is of a sufficiently heinous nature as to require imposition of the death penalty.   The accused is then given the opportunity to prove, by a preponderance of the evidence, that there are mitigating circumstances that might convince the jury that the sentence should nevertheless be set at life imprisonment.   Such an allocation is not offensive to due process.

<u>Zettlemoyer</u>, 500 Pa. at 65-66, 454 A.2d at 963.

As Appellant has not developed an argument convincing us otherwise, we find his instant constitutional challenge to the capital sentencing scheme to be unavailing.

B.   Victim Impact Testimony

Appellant next advances a broad claim that the capital sentencing statute permitting victim impact testimony, 42 Pa.C.S. § 9711(a)(2),[20] is unconstitutional since it

---

[20] Section 9711(a)(2) provides:
   (2) In the sentencing hearing, evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible.   Additionally, evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed.   Evidence shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e), and information concerning the victim and the impact that the death of the victim has had on the family of the victim.   Evidence of aggravating
(continued…)

lacks specific guidance to juries regarding how they must consider such testimony against the statutory aggravating and mitigating circumstances testimony. According to Appellant, the lack of guidance means either that the victim impact testimony, which is, by its nature, emotionally-charged information, adds an arbitrary element into the jury's determination or otherwise disrupts the careful weighing process required in capital cases.[21] To support his argument, Appellant argues Section 9711(a)(2) violates various federal decisions. See Appellant's Brief at 55-56 (citing, inter alia, Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (indicating jury's discretion must be suitably directed and limited to minimize the risk of arbitrary and capricious capital sentencing)).

Appellant's broad constitutional claim involves arguments, which Appellant concedes this Court has previously considered and rejected.[22] See Ballard, supra (holding statute permitting victim impact testimony during penalty phase of a capital murder prosecution to be constitutional); Commonwealth v. Means, 565 Pa. 309, 773 A.2d 143 (2001) (plurality) (rejecting claim that jury is not given proper direction in how to weigh victim impact testimony). Importantly, as this Court has explained:

---

(…continued)
        circumstances shall be limited to those circumstances specified in subsection (d).
42 Pa.C.S. § 9711(a)(2).

[21] Similar to his previous constitutional challenge, Appellant grounds his claim in his rights to due process, equal protection, and freedom from cruel and unusual punishment. However, he fails to develop a specific argument under the provisions.

[22] Appellant asserts he has presented the constitutional claim for preservation purposes.

> [V]ictim testimony is just one of the relevant factors the jury may consider when weighing the aggravating and mitigating circumstances it has found during its deliberations on sentence. The addition of victim impact testimony into the deliberative process is not such an arbitrary factor that its inclusion would preclude meaningful appellate review. We are satisfied that the trial judges of this Commonwealth can adequately prevent unduly prejudicial and inflammatory information from entering into the jury's deliberations in the guise of victim impact testimony.

Ballard, 622 Pa. at 216-17, 80 A.3d at 404 (quoting Means, 773 A.2d at 154) (citations omitted).

Moreover, regarding the jury's weighing of the victim impact testimony in the case sub judice, we note the trial court instructed the jury in a fashion similar to that approved of in Ballard, Means, and Commonwealth v. Taylor, 583 Pa. 170, 876 A.2d 916 (2005). See N.T. 5/24/12, sentencing hearing, at 105-06. Since Appellant has provided us with no new theory upon which we should disregard our precedent, and prevailing federal law permits testimony regarding the impact to family members at the sentencing phase,[23] we find no relief is due.

## X.  Admissibility of Certain Victim Impact Testimony

Anticipating we would reject his constitutional challenge regarding the introduction of victim impact testimony, Appellant next claims the trial court abused its discretion by admitting into evidence certain testimony, which Appellant believes was outside the scope of permissible victim impact testimony. In a related argument, Appellant argues the trial court abused its discretion by not requiring the Commonwealth to provide defense counsel with a written pre-trial victim impact statement with regard to one of the witnesses. To fully understand this claim, some background is required.

---

[23] See Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

Proposed victim impact evidence was reviewed during the penalty phase outside of the presence of the jury. Specifically, the substance of Jessica Hawk's (the victim's sister), Jennifer Lasso's (the victim's wife), and Elsie Stem's (the victim's mother) proposed testimony was set forth in writing, and the trial court overruled the specific objections raised by Appellant.[24] Additionally, as to Donald Lasso (the victim's father), the Commonwealth noted that, although he had not prepared a written statement, the Commonwealth intended to present his testimony during the penalty phase. Specifically, the Commonwealth provided an offer of proof that Donald Lasso would make a brief statement indicating "as a father that he feels such a loss over his son, that they worked on model cars, that he misses him so much, [and] that he saw him every day." N.T. 5/21/12, sentencing hearing, at 32. Defense counsel objected to the Commonwealth failing to provide defense counsel with a written victim impact statement pertaining to Donald Lasso. Id. at 32-34. The Commonwealth responded it had listed Donald Lasso on the formal notice of intent to present victim impact testimony, which was provided to defense counsel. Id. at 33. Accordingly, the trial court ruled Donald Lasso could testify and noted defense counsel was permitted to object as necessary during Mr. Lasso's testimony. Id. at 33-34.

Thereafter, as relevant to Appellant's instant claims, Jessica Hawk testified in accordance with her statement as follows:

> Everyone has heard about Officer Robert Lasso, Officer Lasso. Let me tell you about Robert, my brother….Although he's my little brother, he has always been there for me. **When my husband was sick many years ago, Rob was there to take care of my kids, bring me dinner at the**

---

[24] The portions to which Appellant objected during the review of the proposed victims' impact statements are the same portions which Appellant presently challenges.

**hospital, [and] take care of my house. That all happened the week before his wedding.** Rob has always been there for me. He's always been my rock. And now he's just gone.

One of the things I miss most about Rob are the phone calls. **He'd always answer, yello, hey Lady!**

***

My younger son Owen is 14….**Owen has been devastated by Robert's death, and he wanted to do something for him. So he had wristbands made. He sold them for three dollars each and they read Officer Robert Lasso-our forever hero.**

Rob has always been a hero to my family[.]

Id. at 62-63, 65 (bold added).

Jennifer Lasso testified she and the victim have two children, Rose, who is seven and a half years old, and Frankie, who is five years old. Id. at 78. She then testified in accordance with her statement as follows:

August 11th started out as a great day….We got home and Robert was called in a little bit early to work. No big deal. We had a great day, and we were going to then meet him for dinner. **Rose and I even drove through Freemansburg and saw him around 4:00. He gave us a great big smile and waved. Rose called him around 4:30 to tell him we just picked out Frankie's book bag for preschool.** Little did either of us know that it would be the last time we would talk to Robert.

While I was at Rose's dance practice, I noticed I missed six phone calls. I knew something wasn't right. I was told to get to the hospital right away, Robert was hurt. I could tell it was worse than a broken bone, but I stayed calm and didn't panic. Sitting in traffic on 378, I was starting to freak out a little more. I was upset traffic wasn't moving fast enough, and I just kept thinking **I can handle anything; as long as he wasn't shot in the head,** we can get through.

***

Rose and Frankie not only had their father ripped from their life but they were also stripped of their innocence….There are so many…things that they will miss out on, all because their father **was one of the good guys**.

Id. at 81-83 (bold added).

Elsie Stem testified in accordance with her statement as follows:

**Robert was 31 years old, and like the commercial says I never realized 15 was middle age.** He will always be my baby boy.

\*\*\*

One of the hardest things I've ever had to do was tell my 83-year-old mother that Robert was murdered. **She just screamed, not my Robert over and over again. Those screams will haunt me forever**.

\*\*\*

I, as well as my whole family, will have many memories that will never again include Robert because his life was cut far too short. I will never see **those beautiful blue eyes** look back at me or be able to hug him again.

Id. at 67-68 (bold added).

Donald Lasso admitted he did not write a victim impact statement, and upon questioning by the Commonwealth, he testified substantially similar to the subject matter contained in the Commonwealth's offer of proof. Id. at 74-77. The Commonwealth's final question to Donald Lasso was as follows: "Is there anything else, Mr. Lasso, you'd like to tell the jury about the impact that this had on you personally, sir?" Id. at 77. In response, Donald Lasso testified, "Just that my whole family misses him. **He was such a wonderful boy and so professional about everything. We just miss him so much.**" Id. (bold added).

Respecting the bolded portions of each statement, Appellant reiterates a combination of several claims. Specifically, Appellant argues the statements do not fall within the ambit of proper victim impact testimony since the statements impermissibly focused on Officer Lasso's particular characteristics, related to the effect of his death upon the community at large, and/or were not otherwise a subjective commentary on the consequences of the murder. Appellant cites to Means, 565 Pa. at 333-34, 773 A.2d at 158, for the proposition that "[g]eneralizations of the effect of the victim's death on the community at large [and] information concerning the particular characteristics of the

victim presented in a vacuum will not fall within the ambit of [proper victim impact testimony]."

"[O]ur review in this area is deferential to the trial court's discretion." Ballard, 622 Pa. at 219, 80 A.3d at 405-06 (citation omitted). As our High Court has explained, victim impact evidence is "designed to show…each victim's uniqueness as an individual human being." Payne v. Tennessee, 501 U.S. at 823, 111 S.Ct. at 2600 (italics omitted). As such, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." Commonwealth v. Flor, 606 Pa. 384, 430, 998 A.2d 606, 633 (2010), cert. denied, 131 S.Ct. 2102 (2011) (quotation and quotation marks omitted). When a witness's statement is an individualized and subjective commentary on the consequences of the murder, it is proper victim impact testimony. Commonwealth v. Jordan, 619 Pa. at 538, 65 A.3d at 332-33. "Victim impact testimony is permissible when the Commonwealth establishes that the victim's death had an impact on the victim's family as opposed to presenting mere generalizations of the effect of the death on the community at large." Commonwealth v. Eichinger, 591 Pa. 1, 31, 915 A.2d 1122, 1139 (2007), cert. denied, 552 U.S. 894, 128 S.Ct. 211 (2007).

Moreover, we emphasis that, "[a]lthough the evidence that is the subject of Section 9711(a)(2) has been generally labeled "victim impact" evidence, it is important to note that the text of the statute explicitly refers twice to two types of evidence or information: 'concerning [1] the victim and [2] the impact that the death of the victim has had on the family of the victim.'" Ballard, 622 Pa. at 219, 80 A.3d at 406 (quoting Flor, 998 A.2d at 634); 42 Pa.C.S. § 9711(a)(2). As it relates to the introduction of evidence regarding the

particular characteristics of the victim during the penalty phase, in Commonwealth v. Singley, 582 Pa. 5, 868 A.2d 403 (2005), cert. denied, 546 U.S. 1021, 126 S.Ct. 663 (2005), for example, the appellant, citing to Means, supra, alleged certain testimony constituted improper victim impact testimony since it referred to the victim's particular characteristics. Id. at 24, 868 A.2d at 414. This Court affirmed the trial court's admission of the victim impact statement, which included information as to the good qualities of the victim, particularly as they related to his job. Id. at 25, 868 A.2d at 415. Specifically, the victim's fiancée explained the victim's employer had shut down his plant for some days after the victim's death, and then asked her to participate in an award ceremony to recognize the characteristics exemplified by the victim. Id. In affirming the admissibility of the testimony, we acknowledged the information was not relayed in a vacuum; but rather, it was presented in the context of the fiancée's involvement in the award ceremony, and her family relationships after the victim's death. Id. Similarly, in Flor, supra, this Court found no error in the trial court permitting victim impact testimony which included brief references to the victim's good qualities as a police officer and a person.

Here, beginning with a review of the record concerning the challenged statements of Jessica Hawk, Jennifer Lasso, and Elsie Stem, to which Appellant objected, and placing them in the full context of each witness's testimony, we conclude the statements were proper personal accounts of either the victim, or the victim's death's impact on the family. See Ballard, supra. Contrary to Appellant's suggestion, the testimony was not generalized statements on the effects of Officer Lasso's death on the community, and the references to Officer Lasso's personal characteristics were not made in a vacuum. See

Singley, supra.   More specifically, the statements by Jessica Hawk related to the manner in which the victim took care of her and her family, was a personalized statement of what she would miss about the victim, and explained how her son, who was the victim's nephew, was coping with the loss.   Moreover, the statements by Jennifer Lasso were a personalized account of how she and her young daughter interacted with the victim on their final day together, provided a personal account of how she was informed of the victim's murder, and demonstrated the devastating impact the murder had on the young children in the family.   Finally, the statements by Elsie Stem were a personal account of a mother's loss of her child and how the loss has impacted her, as well as the victim's maternal grandmother.   Additionally, in instructing the jury, the trial court, specifically pointing to the testimony of Jessica Hawk, Jennifer Lasso, and Elsie Stem, cautioned the jury to not let an emotional response limit its rational inquiry into the culpability of Appellant.   N.T. 5/24/12, sentencing transcript, at 105-06.   Accordingly, under our jurisprudence, the testimony was proper and we find no abuse of discretion by the trial court.   See Ballard, supra.

Turning to a review of the record as it relates to Appellant's current challenge to a specific portion of Donald Lasso's testimony, we initially note Appellant did not object to the particular statements at issue.   N.T. 5/24/12, sentencing transcript, at 77.   Though Mr. Lasso offered testimony beyond those statements included in the Commonwealth's verbal offer of proof, it was incumbent upon Appellant to object and give the trial court the option of a corrective measure.   Thus, we find Appellant's claim to be waived.   See Ballard, 622 Pa. at 220, 80 A.3d at 406 (holding that, where victim impact witness

deviated from the approved statement, the appellant was required to object to preserve his claim of error); Pa.R.A.P. 302.

However, this does not end our inquiry as, in a related and broader argument, Appellant suggests the trial court should not have permitted Donald Lasso to offer any victim impact testimony, including the statements at issue, since the Commonwealth failed to provide defense counsel with a pre-trial written victim impact statement from Mr. Lasso.   In support of his argument, Appellant relies on Commonwealth v. Natividad, 565 Pa. 348, 773 A.2d 167 (2001) (plurality), abrogated on other grounds, Commonwealth v. Freeman, 573 Pa. 532, 827 A.2d 385 (2003), for the proposition that the Commonwealth was required to provide Appellant with a written pre-trial victim impact statement from Donald Lasso so that a proper review of the witness's proposed testimony could be conducted.

In Natividad, three justices stated a preference for the Commonwealth to provide to the defense formal pre-trial notice consisting of a list of potential victim impact witnesses and a brief outline of their proffered testimony.   Specifically, the plurality decision held the following:

> Adequate notice is one of the essential elements of procedural due process.   We agree that the better practice is to require notice of the intent to introduce victim impact testimony prior to trial.   A requirement of notice prior to trial enables the defendant to investigate the background of the decedent, and prepare for potential victim impact testimony prior to jury selection.   Nor is it a burden for the Commonwealth to provide pretrial notice limited to a list of potential witnesses and a brief outline of their proffered testimony.

Natividad, 565 Pa. at 366, 773 A.2d at 178 (citation omitted).

Subsequent to Natividad, however, this Court has not amended the Rules of Criminal Procedure to reflect a new judicially created rule reflecting the plurality holding in

Natividad.  More specifically, 42 Pa.C.S. § 9711, which regulates the sentencing hearing process, does not mandate pre-trial notice of victim impact testimony.  Moreover, our subsequent jurisprudence has not expressly adopted the notice requirement suggested in Natividad; but rather, we have examined the issue in terms of analyzing, what, if any, prejudice the appellant may have suffered by the alleged lack of pre-trial notice in the specific case.  See Commonwealth v. Rega, 593 Pa. 659, 705, 933 A.2d 997, 1024 (2007), cert. denied, 552 U.S. 1316, 128 S.Ct. 1879 (2008) (assuming, arguendo, defense counsel was entitled to formal pre-trial notice of potential victim impact witnesses, the appellant did not demonstrate he was prejudiced by the Commonwealth's failure to provide such notice).

In the case sub judice, assuming, arguendo, the Commonwealth was obligated to provide pre-trial notice of Donald Lasso as a potential witness, along with a pre-trial outline of his proffered testimony, we conclude Appellant cannot demonstrate he was prejudiced by any failure in this regard.  Initially, we note the Commonwealth provided defense counsel with pre-trial notice that Donald Lasso would potentially offer victim impact testimony.  Moreover, while the Commonwealth did not provide a pre-trial brief outline of Mr. Lasso's proposed testimony, the Commonwealth provided defense counsel with a verbal offer of proof as to the substance of Mr. Lasso's potential testimony at the sentencing hearing prior to the commencement of testimony.  Appellant acknowledges as much and does not aver he was unfairly surprised by the fact Donald Lasso testified.  Rather, his claim of prejudice is grounded in the assertion that, if he would have been provided with a pre-trial outline of Mr. Lasso's testimony, including the statements at

issue, defense counsel could have made relevant objections prior to Mr. Lasso testifying, as he did with regard to Jessica Hawk, Jennifer Lasso, and Elsie Stem.

We find Appellant's claim of prejudice to be unavailing. Initially, we note defense counsel was not prevented from objecting to specific portions of Donald Lasso's testimony during the sentencing hearing and, in fact, prior to Mr. Lasso testifying, the trial court specifically informed defense counsel he could object, as needed. N.T. 5/21/12, sentencing hearing, at 33-34. To the extent Appellant is suggesting he would have been prejudiced by objecting to portions of Donald Lasso's testimony in front of the jury, we have previously rejected such a claim, noting objections may be made at sidebar. See Ballard, 622 Pa. at 220, 80 A.3d at 406. As Appellant has not demonstrated prejudice as it relates to the notice provided in this case, we find no relief is due.

## XI. Permitting Lyndell Boger to Testify on Rebuttal During Penalty Phase

Appellant's next claim is the trial court erred in permitting Lyndell Boger to testify as a Commonwealth rebuttal witness during the penalty phase. Specifically, Appellant contends Ms. Boger's testimony was inadmissible since it concerned specific allegations of Appellant's prior, uncharged criminal misconduct, it was not relevant to rebut Appellant's character evidence, and in any event, the probative value of the testimony was outweighed by its prejudicial effect.

As it relates to this claim, at the penalty phase, Appellant presented evidence of his character and the circumstances of the offense in an effort to establish the "catch-all" mitigator provided for in 42 Pa.C.S. § 9711(e)(8) ("Mitigating evidence shall include…[a]ny other evidence of mitigation concerning the character and record of the

defendant and the circumstances of his offense.").[25]   In this regard, Appellant presented testimony from numerous witnesses, who testified about Appellant's acts of charity, including riding his motorcycle to raise money for Toys For Tots, donating money to a father after his sixteen year-old son died in a car accident, donating money for children's Christmas parties, donating money so a young family could rent a house, and buying food for a family in need.   N.T. 5/21/12, sentencing hearing, at 96-97, 100, 117, 138-39; N.T. 5/22/12, sentencing hearing, at 47; N.T. 5/23/12, sentencing hearing, at 137.   The witnesses described Appellant as a happy, wonderful, pleasant, hard-working person who helped his neighbors with various tasks and provided housing to people in need. N.T. 5/21/12, sentencing hearing, at 114, 125, 142, 152; N.T. 5/22/12, sentencing hearing, at 15, 46, 48.   The witnesses further described Appellant as a person who enjoyed playing with children, wanting to teach them about fishing and outdoor activities, and indicated Appellant was "real cautious to the kids."   N.T. 5/22/12, sentencing hearing, at 47.

Additionally, Appellant presented testimony to establish that, beginning in approximately 2010, Appellant had a change in his demeanor.   Specifically, witnesses testified they noticed Appellant had become more "distant," and he seemed to be distraught, moody, anxious, angry, and upset easily.   N.T. 5/21/12, sentencing hearing, at 101-02, 116, 149-50; N.T. 5/22/12, sentencing hearing, at 49.   The witnesses suggested Appellant's change in demeanor and deteriorating mental state resulted from, inter alia, the fact Appellant was in pain and taking medicine due to his previous

---

[25] Section 9711(e)(8) is referred to as the "catch-all" mitigator because it encompasses a wide range of evidence, including life history and character.   See Hairston, supra.

accidents.   N.T. 5/21/12, sentencing hearing, at 154; N.T. 5/22/12, sentencing hearing, at 48-50.

After Appellant presented his numerous witnesses, and defense counsel rested, the Commonwealth indicated it intended to call a sole rebuttal witness, Lyndell Boger. N.T. 5/23/12, sentencing hearing, at 158.   Defense counsel objected, arguing the probative value of any testimony from Ms. Boger would be outweighed by its prejudicial effect.   Id. at 158-59.   The trial court requested an offer of proof from the Commonwealth, and the district attorney indicated the following:

> The Commonwealth would call Lyndell Boger, who resides…across the street essentially [from Appellant].   She's going to indicate that--I'm trying to get the date here.
> Your honor, the date of this would be March 6th of 2008.   That her son, who was a teenager at the time, came home and indicated that [Appellant] threatened him and so she decided, the mom, M[s.] Boger, to go over to talk to [Appellant].
> Her boy was playing ball.   She approached [Appellant] and said to him that she felt he was overreacting, that her son was only playing ball, throwing the ball against the wall.   [Appellant]…stated to M[s.] Boger that--[Appellant] stated to M[s.] Boger that if her son bounced the ball against his wall one more time he would shoot him, drag his body onto the porch, and tell the police he was trespassing on his property.
> [Ms.] Boger then contacted the Freemansburg police department about this matter.   We have the report.   Officer Lasso responded and basically he spoke to [Appellant], told him, you know, not to do anything, didn't charge him with anything, and that was the end of the incident.

Id. at 159-60.

Defense counsel argued Ms. Boger's testimony would be improper since no citation was issued in connection with the incident.   Id. at 160.   The Commonwealth responded it was permitted to rebut Appellant's mitigation evidence regarding his good acts and character by revealing that he had made threats to a neighborhood child on a prior occasion.   Id.   Moreover, the Commonwealth responded that Ms. Boger's

testimony was particularly relevant, and probative, since Officer Lasso, the victim in this case, was the investigating officer with regard to Ms. Boger's complaint. Id. at 161. Defense counsel argued Ms. Boger's testimony was irrelevant as it relates to Appellant's character and, since Officer Lasso was involved, the prejudicial effect would be greater. Id. The trial court overruled Appellant's objection, and Ms. Boger testified substantially in accordance with the Commonwealth's offer of proof. Id. at 161-65.

It is clear that, during the penalty phase, a defendant may present any evidence "relevant and admissible" to any mitigating circumstance, including any evidence concerning the character and record of the defendant and the circumstances of his offense. Commonwealth v. Robinson, 583 Pa. 358, 385, 877 A.2d 433, 449 (2005). However, the Commonwealth may offer evidence to rebut a defendant's mitigating evidence of good character and the circumstances of his offense. Commonwealth v. Harris, 550 Pa. 92, 703 A.2d 441 (1997), cert. denied, 525 U.S. 1015, 119 S.Ct. 538 (1998) (upholding Commonwealth's introduction of several statements made by the defendant to rebut his character evidence that he was a nice person and amenable to rehabilitation). That is, the defendant may not offer his mitigation evidence in a vacuum without challenge or rebuttal by the Commonwealth so as to present false or misleading evidence or to create a false impression of his character, record, or the circumstances of the offense. Ballard, 622 Pa. at 212, 80 A.3d at 401; Robinson, supra. Moreover, "the admission of rebuttal testimony is within the sound discretion of the trial court,…and the appropriate scope of rebuttal evidence is defined by the evidence that it is intended to rebut." Ballard, 622 Pa. at 212, 80 A.3d at 401 (quotation, quotation marks, and citations omitted). See Commonwealth v. May, 584 Pa. 640, 659, 887 A.2d 750, 761 (2005), cert.

<u>denied</u>, 549 U.S. 832, 127 S.Ct. 58 (2006) ("Rulings on the admissibility of evidence, including evidence proffered at the penalty phase of a capital trial, are within the discretion of the trial judge, and such rulings will form no basis for appellate relief absent an abuse of discretion.").

Ordinarily, specific instances of conduct involving other crimes are not admissible to prove character. <u>Commonwealth v. Morris</u>, 493 Pa. 164, 425 A.2d 715 (1981). Exceptions to this prohibition exist where the prior bad act is offered to prove, <u>inter alia</u>, motive, intent, plan, or absence of mistake. <u>See id.</u> at 175, 424 A.2d at 720. "These circumstances are most pertinent in the context of establishing guilt." <u>Commonwealth v. Hughes</u>, 581 Pa. 274, 332, 865 A.2d 761, 796 (2004). The present claim, by contrast, concerns a sentencing proceeding, in which the prior bad act evidence was deemed admissible by the trial court as tending to rebut Appellant's evidence of his good character under the "catch-all" mitigator. <u>See id.</u> Contrary to Appellant's scant argument on this point, the prevailing precedent in this area of the law provides that, where a defendant's prior criminal misconduct is relevant to rebut a mitigating circumstance, it is admissible.[26] <u>See id.</u> (suggesting that, if the defendant presents character evidence during the penalty

---

[26] Appellant's entire argument as to this portion of his challenge to Ms. Boger's testimony is as follows:

> First, Ms. Boger's testimony was inadmissible as it dealt with allegations of criminal misconduct by the Defendant which did not result in a criminal charge being filed. <u>See Commonwealth v. Hoover</u>, 16 A.3d 1148 (Pa.Super. 2011). The allegation was investigated by Officer Lasso and no citation was filed against the Defendant. As such the evidence should not have been introduced as character impeachment evidence.

Appellant's Brief at 63.

We note <u>Hoover</u> is not on point as it dealt with issues related to whether the Commonwealth should have been able to cross-examine a defendant's character witnesses about the defendant's prior arrests and/or participation in an Accelerated Rehabilitative Disposition program during the guilt phase of a criminal proceeding.

phase in furtherance of establishing the "catch-all" mitigator, the Commonwealth may offer relevant rebuttal evidence, including specific instances of prior criminal misconduct for which the defendant was not convicted).

Here, Appellant adduced substantial testimony in furtherance of establishing his good character and providing an explanation for the circumstances of his offense, including testimony seeking to portray himself as someone who assisted his neighbors, had a "soft spot" for children, and whose demeanor was pleasant and happy until approximately 2010, when his demeanor and mental state deteriorated dramatically due to pain and the use of prescribed medications. The Commonwealth's rebuttal witness's testimony, on the other hand, demonstrated that, more than three years prior to the killing of Officer Lasso, in 2008, Appellant threatened to kill a fourteen-year-old neighbor boy simply because the child was throwing a tennis ball off the wall of Appellant's home. As the trial court concluded, Ms. Boger's testimony relevantly rebutted the impression of good character, which Appellant was attempting to establish, as well as Appellant's attempts to provide an explanation for the circumstances of his offense.

Appellant maintains, however, that even if Ms. Boger's testimony was relevant during the penalty phase, the prejudicial effect outweighed its probative value. We recognize that, although relevant, evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. Unfair prejudice means "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Id. (Cmt). See Commonwealth v. Brown, 605 Pa.

103, 122, 987 A.2d 699, 710 (2009), <u>cert. denied</u>, 562 U.S. 844, 131 S.Ct. 76 (2010) (applying Pa.R.E. 403 to evidence offered during the penalty phase of capital direct appeal).

Appellant suggests he was unfairly prejudiced by Ms. Boger's testimony since "its real effect [was] to show [Appellant] would shoot anyone who came on his property and claim they were trespassing." Appellant's Brief at 64. However, Ms. Boger never testified that Appellant shot her son, and instead, she testified Appellant made threats towards her son. As indicated, such testimony rebutted Appellant's portrayal of himself as a charitable, wonderful, "kid-loving" neighbor. Moreover, inasmuch as Appellant attempted to demonstrate his demeanor did not change until sometime around 2010, Ms. Boger's testimony refuted this version by highlighting the incident between Appellant and her son occurred in 2008. Lastly, the fact Officer Lasso was the same officer who responded to the scene in 2008 to investigate a neighborhood dispute, and then was subsequently shot by Appellant in 2011 as he investigated an unrelated neighborhood dispute, was relevant to rebut Appellant's claim of mitigation as it related to the circumstances of the offense. This portion of Ms. Boger's testimony shed light on the fact Officer Lasso had previously investigated complaints made against Appellant and, thus, the incident in 2011 was not Appellant's first contact with the officer. Therefore, in weighing the relevance and probative value of Ms. Boger's rebuttal testimony against its prejudicial effects, we find the trial court's permissive allowance of her testimony to rebut the character evidence presented by Appellant at the penalty phase did not constitute an abuse of discretion.

### XII. Cross-Examination of Defense Witness Robert Henninger

Appellant's next argument is, during the penalty phase, the trial court improperly permitted the Commonwealth to cross-examine Appellant's character witness, Robert Henninger, as to whether he was aware Appellant's now ex-wife, Jeanette Hitcho, filed a protection from abuse (PFA) action against Appellant. Appellant contends the Commonwealth's cross-examination of Mr. Henninger was improper since it concerned specific allegations of Appellant's prior criminal misconduct for which he was not convicted. Additionally, he suggests the Commonwealth's cross-examination was irrelevant and unduly prejudicial.

During the penalty phase, as indicated supra, Appellant presented testimony from numerous witnesses, including Mr. Henninger, in furtherance of establishing his good character. Specifically, as relevant to the instant claim, Mr. Henninger testified on direct examination that he has been friends with Appellant for approximately twenty years, and he spent time with Appellant, Appellant's now ex-wife, and their children. N.T. 5/21/12, sentencing hearing, at 91. He indicated their families would spend time together, particularly on Sundays, "hanging out" and fishing. Id. at 90-92. Mr. Henninger described Appellant's interaction with his family and Mr. Henninger's family as a "normal family thing." Id. at 92.

On cross-examination, without objection by defense counsel, the Commonwealth asked Mr. Henninger the following question: "And you would agree that th[e] relationship [between Appellant and Jeanette] was not very good, was it?" Id. at 105. Mr. Henninger replied, "They seemed to get along fairly well, from what I seen." Id. Furthermore, without objection, the Commonwealth asked Mr. Henninger whether he was aware that there were "lots of issues between them in terms of having fights and stuff?"

Id. at 106. Mr. Henninger testified, "They had arguments, yes." Id. The following relevant exchange then occurred:

[DISTRICT ATTORNEY]: Are you aware of any hostilities between Jeanette and [Appellant] back then?
[MR. HENNINGER]: Not that I know of, no.
[DISTRICT ATTORNEY]: Were you aware that she filed for protection--
    [DEFENSE COUNSEL]: Objection, your honor.
    THE COURT: Approach the bench.
        (The following discussion was held at sidebar).
    [DEFENSE COUNSEL]: Judge, he said he doesn't know, so he can't answer the question. He's not going to know about the protection from abuse action. Secondly, judge, I think it's prejudicial. Probative value is outweighed by prejudice. Plus, we're going to have Jeanette Hitcho testify, so she is the best person to explain, if the Commonwealth can get into that, as to what the circumstances were around that.
    [DISTRICT ATTORNEY]: Your honor, this is the penalty phase. Guilt and innocence are over. He's offered for good character. That was the question [defense counsel] asked, if he was aware of his character.
        He said he saw a loving relationship between his wife and kid. We are allowed to get into the fact that there is violence in this guy's background directed to the wife, children, and I just asked him if he was aware of this or not. If [defense counsel] tells me he's going to call Jeanette Hitcho as a witness, I'm going to ask her questions about PFAs that she filed against him.[27]
    THE COURT: Did he say he'd meet with his wife and children?
    [DEFENSE COUNSEL]: On Sundays, yes.
    THE COURT: His exact language was it was like a family thing.
    [DEFENSE COUNSEL]: He did say that. My objection with him is he says he doesn't know. He's already said I don't know about things like that.
    THE COURT: If he had an anger problem? What was the question?
    [DISTRICT ATTORNEY]: The last question was, was he aware that Jeanette Hitcho filed for protection from abuse against [Appellant]. If he says no, I want to put the defense on notice here that we are--he's putting evidence of what a good guy he is. On rebuttal, I can bring in all the people who he threatened, he was a loudmouth to, he was angry. They don't get to get that evidence in, in a vacuum.
    [DEFENSE COUNSEL]: We understand that, but the statute requires us to do that. But I think for this person we can fret about it later.

---

27   For clarification, we note Jeanette Hitcho did not testify during the penalty phase.

**THE COURT:** He said he didn't know. I'll overrule the objection and let you explore a little bit further.

(End of discussion at sidebar).

**[DISTRICT ATTORNEY]:** Mr. Henninger, you indicated that you knew Jeanette Hitcho, [Appellant's] ex-wife, and that you observed the relationship between her and [Appellant] and their children over some period of time, and I would like to ask you whether you were aware that Jeanette Hitcho had to file for a protection from abuse petition against [Appellant]?

Are you aware of that?

**[MR. HENNINGER]:** No, I wasn't.

Id. at 106-09 (footnote added).

Initially, Appellant presently argues that the PFA order at issue was entered by consent of the parties, and therefore, it does not qualify as "a conviction." See Appellant's Brief at 66-67. As such, relying on Hoover, supra, Appellant suggests the existence of the PFA order was inadmissible to impeach his character witness's testimony. Id. However, our review of the record confirms Appellant has waived this specific claim since he did not present the argument as a basis for his objection in the trial court. See Commonwealth v. Smith, 604 Pa. 126, 158, 985 A.2d 886, 904 (2009), cert. denied, 131 S.Ct. 77 (2010) ("[I]t is beyond cavil that if the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived.") (quotation and quotation marks omitted)); Commonwealth v. Cousar, 593 Pa. 204, 231, 928 A.2d 1025, 1041 (2007), cert. denied, 553 U.S. 1035, 128 S.Ct. 2429 (2008) ("[A] party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made.") (quotation, quotation marks, and citation omitted)).

This does not end our inquiry, however, as Appellant further suggests, in claims preserved in the trial court, the Commonwealth's cross-examination was irrelevant and

unduly prejudicial since it went beyond the scope of direct examination and failed to address Appellant's character traits elicited on direct. As indicated supra, a defendant may present any evidence "relevant and admissible" to any mitigating circumstance. Robinson, 583 Pa. at 385, 877 A.2d at 449. "However, [A]ppellant may not offer this evidence in a vacuum without challenge or rebuttal by the Commonwealth." Id. (citation omitted). "The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." Ballard, 622 Pa. at 200, 80 A.3d at 394 (quotation and quotation marks omitted).

The trial court concluded the Commonwealth's cross-examination of Mr. Henninger concerning his knowledge of the existence of the PFA order was not irrelevant or unduly prejudicial, as it was an attempt to discredit Mr. Henninger's direct examination character testimony, which suggested Appellant's interaction with his family, including his now ex-wife, was "normal." As the trial court noted, the Commonwealth was permitted to challenge the version of Appellant's character, which Mr. Henninger was trying to present to the jury on Appellant's behalf.

In any event, assuming the trial court erred in permitting the Commonwealth to question Mr. Henninger concerning his awareness of the PFA order, we conclude the trial court's determination to permit the cross-examination was harmless error. Without objection, the Commonwealth elicited testimony from Mr. Henninger, who admitted that Appellant "had the ability to be loud and angry at times," and Appellant and Jeanette "had arguments." N.T. 5/21/12, sentencing hearing, at 106, 109. Additionally, Appellant's character witness, Timothy Hunger, who was Appellant's long-time friend, admitted on cross-examination, without objection, that he was aware that Jeanette had filed a PFA

action against Appellant alleging he was physically abusing her and their son. N.T. 5/22/12, sentencing hearing, at 51-52. Also, Appellant's character witness, Wayne Yerger, who had been friends with Appellant for thirty years, admitted on cross-examination, without objection, that he told the police Appellant was physically abusive to his female partners, including his ex-wife, Jeanette, as well as their son. N.T. 5/21/12, sentencing hearing, at 147. Further, defense witness John Stahr, who conducted a criminal record check on behalf of Appellant, admitted on direct examination that Jeanette had received a final PFA order against Appellant on September 17, 2003. N.T. 5/23/12, sentencing hearing, at 149-50. On cross-examination, Mr. Stahr, without objection, confirmed the allegations of the abuse underlying the PFA order, including the fact Appellant banged Jeanette's head on the floor and threw her to the ground, as well as grabbed their eleven-year-old son by the throat and lifted him off the ground. Id. at 153-54. He explained the final order was entered "[u]pon agreement of the parties for entry of a consent order, [and the] order w[as] entered without any admission of liability by [Appellant] and without a finding of abuse by [the] court." Id. at 155. Moreover, as discussed more fully infra, Appellant's character witness, Kelly Yerger, admitted on cross-examination, without objection, that Appellant was an arrogant, "loudmouth" who was violent and committed domestic abuse on his female partners, including Jeanette. N.T. 5/21/12, sentencing hearing, at 132. Thus, no relief is due on this claim. See Ballard, 622 Pa. at 207, 80 A.3d at 398 (indicating harmless error exists where the error did not prejudice the defendant or the prejudice was de minimis; or the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence).

### XIII. Recross-Examination of Defense Witness Kelly Yerger

Appellant's next argument is that, at the penalty phase, during the recross-examination of Appellant's character witness, Kelly Yerger, the trial court improperly permitted the Commonwealth, over objection, to question Mrs. Yerger as to whether Appellant committed abuse against Jeanette during the time he was her husband. Appellant suggests the question was an improper inquiry into his specific criminal misconduct for which he was not convicted, and in any event, the probative value was outweighed by its prejudicial effect.

During the cross-examination of Mrs. Yerger, the Commonwealth, without objection, asked Mrs. Yerger, "Do you remember telling the state police that [Appellant is] violent and committed domestic abuse on his female partners?" N.T. 5/21/12, sentencing hearing, at 132. Mrs. Yerger replied, "Yes. I answered that question yes."

Id. Subsequently, on recross-examination, the following relevant exchange occurred:

> **[DISTRICT ATTORNEY]:** Mrs. Yerger, when you spoke to the police, you said--you said [Appellant] is violent and committed domestic abuse on his female partners, plural. You were aware there was more than one woman, correct?
> **[MRS. YERGER]:** There's--there's multiple people that he's dated.
> **[DISTRICT ATTORNEY]:** I understand. Did you know Jeanette Hitcho?
> **[MRS. YERGER]:** Yes.
> **[DISTRICT ATTORNEY]:** And that was one of the partners you were talking about, correct?
> **[MRS. YERGER]:** Yes.
> **[DISTRICT ATTORNEY]:** He committed abuse to her as a husband--
> **[DEFENSE COUNSEL]:** Objection, your honor.
> **THE COURT:** It's overruled.
> **[DISTRICT ATTORNEY]:** --correct?
> **[MRS. YERGER]:** Correct.

Id. at 134-35.

We dispose of this claim by noting that any error with regard to the trial court permitting the challenged question on recross-examination was harmless. As it relates to Appellant abusing Jeanette during their marriage, as discussed in detail in Section XII, supra, numerous witnesses testified, without objection, regarding the alleged abuse. Therefore, any error in the trial court permitting Mrs. Yerger to clarify that Appellant abused Jeanette during the parties' marriage, as opposed to when she was "just a female partner,"[28] warrants no relief. See Ballard, supra.

### XIV. Direct Examination of David Wollman and Louise Luck

Appellant's next contention is that, during the penalty phase, the trial court improperly limited Appellant's direct examination of David Wollman, who was Appellant's stepbrother, as well as Louise Luck, who Appellant presented as a capital mitigation specialist.[29] Specifically, Appellant argues the trial court erred in ruling that Mr. Wollman and Ms. Luck were not permitted to testify that Appellant had told them he had been sexually abused while he was at the New Boys Life Ranch since such testimony would constitute inadmissible hearsay. As further discussed infra, we find any error attributed to the trial court's ruling to be harmless.

---

[28] To the extent Appellant suggests the trial court erred in permitting the Commonwealth to question Mrs. Yerger regarding Appellant's abuse of "female partners," thus creating a nameless, faceless group of battered females, see Appellant's brief at 68-69, we conclude the claim is waived due to defense counsel's failure to lodge an objection thereto. See Pa.R.A.P. 302(a).

[29] Ms. Luck explained the defense hired her to provide background information on Appellant, and in preparation thereof, she interviewed over fifty people, examined numerous records pertaining to Appellant, and prepared a multigenerational family history.

In order to place Appellant's current claim in context, we note that, during the penalty phase, the following relevant exchange occurred during defense counsel's direct examination of Mr. Wollman:

> **[DEFENSE COUNSEL]:** Now, did you attend the--did [Appellant] ever--did you attend the New Boys [Life] Ranch?
> **[MR. WOLLMAN]:** Yes.
> **[DEFENSE COUNSEL]:** Was [Appellant] there?
> **[MR. WOLLMAN]:** Yes.
> **[DEFENSE COUNSEL]:** Thereafter, sometime later in approximately 1994, did [Appellant] indicate anything happened to him at the New Boys [Life] Ranch?
> **[MR. WOLLMAN]:** Yes.
> **[DEFENSE COUNSEL]:** What did he indicate?
> **[MR. WOLLMAN]:** There was molestation.
> **[DISTRICT ATTORNEY]:** Objection, your honor. This is complete hearsay.
> **THE COURT:** Approach the bench.

N.T. 5/22/12, sentencing hearing, at 20. The trial court dismissed the jury, and during the course of arguing Mr. Wollman's testimony was proper, defense counsel also indicated, "[W]hy can't I say he told M[s.] Luck that, too?" Id. at 26. In response, the Commonwealth indicated it would object to Ms. Luck testifying that Appellant told her he was sexually molested twenty years ago; however, the Commonwealth indicated it would not object to Ms. Luck testifying that Appellant's medical records revealed Appellant informed his treating psychiatrist, Eric D. Becker, M.D., that he had been sexually abused by a guard while in detention at the New Boys Life Ranch. Id. at 26-36. The trial court ruled, "I don't see an exception to the hearsay rule and…I will sustain the objection." Id. at 38.[30]

---

[30] There is some dispute as to whether the trial court intended its ruling to apply solely to the direct examination of Mr. Wollman or whether the trial court further intended to limit defense counsel's anticipated direct examination of Ms. Luck. See Appellant's Brief at (continued…)

Thereafter, defense counsel did not question Mr. Wollman further regarding Appellant's alleged sexual abuse. However, on the direct examination of Ms. Luck, defense counsel asked Ms. Luck whether she reviewed Dr. Becker's records, and Ms. Luck answered affirmatively. Id. at 116. She indicated Appellant was treated by Dr. Becker in 2003. Moreover, the following relevant exchange occurred:

> **[DEFENSE COUNSEL]:** I'm just going to show you Dr. Becker's records. You have seen those before?
> **[MS. LUCK]:** Yes, I have. He's given two medications, Zyprexa, which is an antipsychotic medication, and Tegretol, both medications, and that's used to treat bipolar disorder.
> **[DEFENSE COUNSEL]:** And under history of physical or sexual abuse, what, if anything, did he respond, he meaning [Appellant], at the top of the page?
> **[MS. LUCK]:** Yes. History of sexual abuse. Sexually abused by a guard in detention, and I was able to interview several other individuals that substantiated.
> > **[DISTRICT ATTORNEY]:** Objection, your honor. That's hearsay.
> > **THE COURT:** It's overruled.

Id. at 116-17.

Additionally, it is noteworthy that, during the direct examination of Wayne Yerger at the penalty phase, Mr. Yerger testified Appellant told him "something about" being sexually abused while he was at the New Boys Life Ranch; however, Appellant would not go into detail about the abuse. N.T. 5/21/12, sentencing hearing, at 143-44.

---

(…continued)
74 (indicating trial court's ruling applied to both witnesses); Trial Court Opinion dated 11/27/13 at 131 (disagreeing with Appellant's characterization of the court's rulings on the matter); Commonwealth's Brief at 51-53 (implicitly accepting the proposition that the trial court's ruling pertained to statements Appellant may have made to Mr. Wollman and Ms. Luck). Regardless, assuming, arguendo, Appellant is correct that the trial court prevented defense counsel from questioning Mr. Wollman and Ms. Luck as to statements of sexual abuse, which Appellant may have made to them, we find he is not entitled to relief if, as the Commonwealth claims, the error was harmless. See Mitchell, supra.

Appellant complains the trial court prevented Mr. Wollman and Ms. Luck from testifying Appellant told them he had been sexually abused at the New Boys Life Ranch; however, as the Commonwealth astutely argues, the jury heard testimony relative to Appellant's allegations of sexual abuse. Consequently, Appellant is not entitled to relief in this regard. See Mitchell, 588 Pa. at 63, 902 A.2d at 457 (indicating harmless error exists if the error did not prejudice the defendant or the prejudice was de minimis).

## XV. Statutory Review

As noted above, this Court is required to affirm the death sentence unless we find "the sentence was the product of passion, prejudice or any other arbitrary factor; or the evidence fails to support the finding of at least one aggravating circumstance." Ballard, 622 Pa. at 233, 80 A.3d at 414 (citing 42 Pa.C.S. § 9711(h)(3)). After a thorough review, we conclude Appellant's death sentence was not the product of passion, prejudice or any other arbitrary factor; but rather, it was supported by overwhelming evidence, detailed above, that Appellant killed Officer Lasso. Moreover, the evidence supported the jury's finding of an aggravating circumstance under Section 9711(d)(1) (the victim was a peace officer or local law enforcement official who was killed in the performance of his duties). Since the jury concluded unanimously that the aggravating circumstance outweighed the mitigating circumstances they found, the jury was statutorily required to impose this sentence of death under 42 Pa.C.S. § 9711(c)(1)(iv). Thus, there is no basis upon which to upset the death verdict.

## XVI. Conclusion

For the foregoing reasons, Appellant's judgment of sentence is affirmed.[31]

Messrs. Justice Eakin and Baer and Madame Justice Todd join the opinion.

Mr. Chief Justice Saylor files a concurring opinion.

---

[31] The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence, and the opinion and order of our Court in accordance with 42 Pa.C.S. § 9711(i).