**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDWYN ST CHARLES LACEY | : | |
| | : | |
| Appellant | : | No. 626 WDA 2023 |

Appeal from the Judgment of Sentence Entered December 9, 2022
In the Court of Common Pleas of Venango County Criminal Division at
No(s): CP-61-CR-0000352-2021

BEFORE: KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BECK, J.: **FILED: August 8, 2024**

Edwyn St Charles Lacey ("Lacey") appeals from the judgment of sentence imposed by the Venango County Court of Common Pleas ("trial court") after a jury convicted him of involuntary manslaughter, drug delivery resulting in death, criminal use of a communication facility, and delivery of a controlled substance (cocaine).[1] We affirm.

This case arises from the drug overdose death of William Zeigler ("Zeigler"). On the night of July 9, 2020, Zeigler told Douglas Baker ("Baker"), Zeigler's friend and roommate, that he wanted to buy a half a gram of cocaine to smoke. Baker then texted Lacey and requested the drugs for himself,

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2504(a), 2506(a), 7512(a); 35 P.S. § 780-113(a)(30).

Zeigler, and Tasia Tate ("Tate"), who was with Baker and Zeigler at their residence on the night in question. Roughly a half an hour later, Lacey arrived at Baker's and Zeigler's residence in a rented U-Haul truck, handed over the drugs in exchange for cash, and then quickly left. Shortly thereafter, Baker began to smoke the drugs he had received from Lacey. As he began to smoke the drugs, Baker noticed that it did not taste like cocaine and that it did not give him the same rush or sense of euphoria that it normally did and that instead it made him weak and unable to see. Baker attempted to stop Zeigler from smoking the drugs but was too late, as Zeigler had already began smoking from his own pipe. Baker then became unconscious and later awoke to EMTs administering NARCAN to him. At this time, Baker also saw Zeigler lying unconscious on the floor with EMTs performing CPR on him.

Zeigler was pronounced dead at the scene. Dr. Eric Vey, the forensic pathologist who conducted Zeigler's autopsy, determined that Zeigler died because of combined drug toxicity with fentanyl toxicity being a substantial factor in his cause of death. Police did not recover any drugs or drug paraphernalia from the scene.

Lacey was charged with involuntary manslaughter, drug delivery resulting in death, criminal use of a communication facility, delivery of a controlled substance (cocaine), and delivery of a controlled substance (fentanyl). Following a two-day jury trial on November 14 and 15, 2022, the jury found Lacey guilty on all counts except delivery of a controlled substance

(fentanyl). On December 9, 2022, the trial court sentenced Lacey to an aggregate term of eight to sixteen years of incarceration.

On December 19, 2022, Lacey filed post-sentence motions in which he also requested an extension of time to file supplemental post-trial motions pursuant to Pennsylvania Rule of Criminal Procedure 720(B)(3)(b). On March 8, 2023, the trial court granted a thirty-day extension and on March 30, 2023, Lacey filed supplemental post-trial motions.[2] On April 21, 2023, Lacey's trial counsel filed a motion to withdraw from the case citing a breakdown in the attorney-client relationship. On May 8, 2023, the trial court entered orders denying Lacey's post-trial motions and granting trial counsel's motion to withdraw. On June 1, 2023, Lacey filed a timely notice of appeal, pro se, to this Court. Both the trial court and Lacey complied with Pennsylvania Rule of Appellate Procedure 1925.

On June 26, 2023, because there was no indication in the trial court docket as to whether Lacey had waived his right to counsel on direct appeal after the trial court permitted trial counsel to withdraw, this Court issued an order directing the trial court to clarify whether Lacey knowingly, intelligently,

---

[2] Pennsylvania Rule of Criminal Procedure 720(B)(3)(a) states that trial courts must decide post-sentence motions within 120 days of filing, which in this case, would have been Monday, April 18, 2023. **See** Pa.R.Crim.P. 720(B)(3)(a). Pursuant to Rule 720(B)(3)(b), the trial court may grant one thirty-day extension for a decision on the motion. Pa.R.Crim.P. 720(B)(3)(b). Here, the trial court granted a thirty-day extension of time for a decision on Lacey's post-sentence motions. Thus, the trial court had 150 days, or until May 18, 2023, to render its decision.

and voluntarily waived his right to counsel pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1988). The trial court responded by letter dated August 1, 2023, and indicated that Lacey had not knowingly, intelligently, and voluntarily waived his right to counsel, and that consequently, the trial court appointed counsel to represent Lacey for this appeal. Response Letter, 8/1/2023. Appellate counsel subsequently filed an advocate's brief on Lacey's behalf. We therefore turn our attention to the merits of Lacey's appeal.

Lacey presents the following questions for review:

1. Whether the [trial] court erred as a matter of law or abused its discretion, when denying the claim of insufficiency of the evidence for [c]ount 1 of the trial jury verdict, drug delivery resulting in death[,] when there was no evidence that [Lacey] was a substantial cause [sic] of death.

2. Whether the [trial] court erred as a matter of law or abused its discretion, when denying the claim of insufficiency of the evidence for [c]ount 5 of the trial jury verdict, [i]nvoluntary [m]anslaughter, where [Lacey] was found not guilty of deliver[y] of [f]entanyl so there is no evidence of his actions being reckless or grossly negligent.

3. Whether the [trial] court erred as a matter of law or abused its discretion, when denying the claim of insufficiency of the evidence for [c]ount 2 of the trial jury verdict, [c]riminal [u]se of a [c]ommunication [f]acility[,] due to the time frame of [Lacey]'s arrival being different than the delivery of drugs.

4. Whether the [trial] court erred as a matter of law or abused its discretion, when denying the claim of insufficiency of the evidence for [c]ount 4 of the trial jury verdict, [d]elivery of [a controlled substance], [because] no cocaine was found at the scene and the delivery occurred after [Lacey] left.

5. Whether the [trial] court erred as a matter of law or abused its discretion, when permitting prejudicial evidence of Officer

- 4 -

[Josh] Wheeling testifying to seeing [Lacey] at the residence before and for drug dealing out of Ohio.

6.      Whether the [trial] court erred as a matter of law or abused its discretion[] when denying [Lacey]'s submission of a police report showing that the witness did not know what the victim had taken[.]

7.      Whether the [trial] court erred as a matter of law or abused its discretion[] when denying [Lacey]'s motion that the jury instruction on the delivery of cocaine/fentanyl was given a[s] "cocaine and fentanyl" and the [C]ommonwealth's argument was "cocaine mixed with fentanyl."

8.      Whether the [trial] court erred as a matter of law or abused its discretion, when denying the claim [of] prosecutorial misconduct when in the closing argument[,] the district attorney expressed his personal opinion of the guilt of [Lacey], why a witness was cleaning the crime scene, and the meaning of the correspondence in text messages.

9.      Whether the [trial] court erred as a matter of law or abused its discretion[] when calculating his prior record score, the court gave one point for his State of Ohio offense of "[b]reaking and [e]ntering" calculating it as a [c]riminal [t]respass where the breaking and [e]ntering is a[n] unoccupied structure.

Lacey's Brief at 7-9.[3]

Lacey's first four issues challenge the sufficiency of the evidence to support each of his convictions.  Our Court's standard of review of a challenge to the sufficiency of the evidence is well settled:

In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense.  Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact

_____

[3] Reordered for ease of review.

- 5 -

finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

**Commonwealth v. Juray**, 275 A.3d 1037, 1042 (Pa. Super. 2022) (quotation marks and citations omitted).

For his first and second issues, Lacey argues that the evidence was insufficient to sustain his convictions of drug delivery resulting in death and involuntary manslaughter. Lacey's Brief at 15-17, 20-22. Specifically, Lacey contends that the Commonwealth failed to present evidence that Lacey caused Zeigler's death because the drug that Dr. Vey determined was a substantial factor in Zeigler's overdose death was fentanyl and the jury acquitted Lacey of delivery of a controlled substance (fentanyl). **Id.** Consequently, Lacey asserts, the Commonwealth did not establish that his actions were either reckless or grossly negligent. **Id.**

Before outlining the individual elements for each of the specific offenses Lacey challenges, we address the common element of the two crimes Lacey contends the Commonwealth did not prove, causation. For our purposes, the Pennsylvania Crimes Code provides that "[c]onduct is the cause of a result when … it is an antecedent but for which the result in question would not have occurred[.]" 18 Pa.C.S. § 303(a)(1). The statute "requires a 'but-for' test of causation ... [with the caveat that] the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." **Commonwealth v.**

*Kakhankham*, 132 A.3d 986, 993 (Pa. Super. 2015) (citations and internal quotation marks omitted).

The crime of drug delivery resulting in death occurs if a "person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of … The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance."  18 Pa.C.S. § 2506(a).  Thus, drug delivery resulting in death "consists of two principal elements: (i) [i]ntentionally administering, dispensing, delivering, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance and (ii) death caused by ('resulting from') the use of that drug."  *Kakhankham*, 132 A.3d at 991-92 (some quotation marks omitted).  Although the Commonwealth must prove that the defendant acted intentionally with respect to the drug delivery, the Commonwealth only needs to show the defendant acted recklessly in causing the death:

> [T]he applicable mens rea for the crime of drug delivery resulting in death is two-fold.  First, the delivery, distribution or sale of the contraband must be intentional.  Second, the actual death must be the reckless result of the actions of the defendant.  As such, the crime is an intentional act in providing contraband, with a reckless disregard of death from the use of the contraband.

*Commonwealth v. Burton*, 234 A.3d 824, 830 (Pa. Super. 2020)

"A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or

the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S. § 2504(a). Thus, a defendant commits involuntary manslaughter when they: (1) commit an act, (2) with a reckless state of mind, and (3) the act causes the victim's death. *Commonwealth v. Arrington*, 247 A.3d 456, 461 (Pa. Super. 2021); *see also* 18 Pa.C.S. § 2504(a).

The certified record reflects that on the night of July 9, 2020, Zeigler, Baker, and Tate wanted to purchase and smoke crack cocaine and that Baker texted Lacey so that they could purchase cocaine from him. N.T., 11/14/2022, at 45-47. Lacey delivered the drugs a short time later, took the money Baker and Zeigler had set aside for the drugs, and left the residence. *Id.* at 53. Baker testified that when he began smoking the drugs, he noticed that "[i]t just didn't taste right. It just didn't taste like [c]ocaine." *Id.* at 55. Baker, who had begun using the drugs before Zeigler, stated that he tried to stop Zeigler from smoking the drugs, but was too late. *Id.* Baker said that he then began to feel weak, that he had trouble seeing, and that he then passed out. *Id.* at 55-56. Baker said the next thing he remembered was awaking to EMTs administering NARCAN to him, and he saw other emergency medical personnel attempting to revive Zeigler. *Id.* at 56-57. Baker testified that he did not know Zeigler to use any other drugs besides cocaine, that they had not used any other drugs the day Zeigler died, and that they were not in possession of any other drugs on the night in question. *Id.* at 44-46, 56-57.

Additionally, Dr. Vey testified that Zeigler "died as a result of combined drug toxicity" and that the substantial factor resulting in Zeigler's death was the presence of fentanyl in his blood. *Id.* at 179. Specifically, Dr. Vey explained that the toxicology report revealed that Zeigler had several drugs in his blood including cocaine and fentanyl, but that the amount of fentanyl in his blood was roughly two-and-half times the lethal threshold. *Id.* at 174-75. Dr. Vey stated that but for the amount of fentanyl in his blood, Zeigler likely would not have died. *Id.* at 175-76.

Based on the foregoing, we conclude that the record contains evidence sufficient to sustain Lacey's convictions of drug delivery resulting in death and involuntary manslaughter. The record reveals that Baker and Zeigler arranged to buy cocaine from Lacey, that Lacey delivered drugs to Baker and Zeigler that contained a lethal amount of fentanyl, that Baker and Zeigler were not in possession of any other drugs, and that Zeigler used the drugs that Lacey delivered, which resulted in his death. Thus, the Commonwealth presented evidence that was more than sufficient to prove that Lacey intentionally delivered drugs to Baker and Zeigler, that he did so with a reckless disregard that the contents of those drugs could result in death, and that Zeigler died from using those drugs.

To the extent Lacey argues that the evidence was insufficient to sustain his convictions of drug delivery resulting in death and involuntary manslaughter because he was acquitted of delivery of a controlled substance

- 9 -

(fentanyl), which resulted in an inconsistent verdict, such a claim does not entitle him to relief. As this Court has explained, inconsistent verdicts are permissible in Pennsylvania:

> We note first that inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Consistency in verdicts in criminal cases is not necessary. When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is evidence to support the verdict.
>
> The rule that inconsistent verdicts do not constitute reversible error applies even where the acquitted offense is a lesser included offense of the charge for which a defendant is found guilty.

**Burton**, 234 A.3d at 829 (quotation marks and citation omitted). Accordingly, Lacey's first and second claims fail.

For his third and fourth issues, Lacey argues that the evidence was insufficient to sustain his convictions of criminal use of a communication facility and delivery of a controlled substance (cocaine). Lacey's Brief at 17-20. Specifically, Lacey contends that the Commonwealth failed to present evidence that Lacey delivered the drugs to Baker and Zeigler because Baker testified that Lacey made the delivery at around 10:00 p.m. on the night in question, but video footage from a neighbor's doorbell camera showed Lacey leaving their residence at 9:40 p.m. *Id.* at 18. Lacey further asserts that the

Commonwealth did not present any evidence that there was cocaine at the scene. *Id.* at 20.

The Crimes Code defines criminal use of a communication facility as "us[ing] a communication facility to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title or under ... the Controlled Substance, Drug, Device and Cosmetic Act." 18 Pa.C.S. § 7512(a). A communication facility is "a public or private instrumentality used or useful in the transmission of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part, including, but not limited to, telephone, wire, radio, electromagnetic, photoelectronic or photo-optical systems or the mail." *Id.* § 7512(c).

To sustain a conviction of criminal use of a communication facility, "the Commonwealth must prove … : (1) [the defendant] knowingly and intentionally used a communication facility; (2) [the defendant] knowingly, intentionally or recklessly facilitated an underlying felony; and (3) the underlying felony occurred." *Commonwealth v. Moss*, 852 A.2d 374, 382 (Pa. Super. 2004). "Facilitation" is "any use of a communication facility that makes easier the commission of the underlying felony." *Id.*

The Crimes Code defines delivery of a controlled substance as "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a

practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance." 35 P.S. § 780-113(a)(30). Here, Lacey does not contest that cocaine is a controlled substance under the Controlled Substance, Drug, Device and Cosmetic Act or that a cellphone is a communication facility.

The certified record reflects that on the night of July 9, 2020, Baker texted Lacey so that he, Zeigler, and Tate could purchase cocaine from him. N.T., 11/14/2022, at 45-47. The record further reflects that Baker texted Lacey with this request at 9:28 p.m. *Id.* at 50-51. Lacey texted back "Ok" two minutes later. *Id.* at 51. When asked how long after he sent the text did Lacey arrive at his residence with the drugs, Baker testified "Oh, I'm going to say it was over a half hour but not an hour. I'm not quite sure. It was pretty quick." *Id.* at 52. Video footage from a neighbor's doorbell camera shows an individual arriving at Baker's and Zeigler's residence at 9:34 p.m. on the night in question in a rented U-Haul truck, and departing at around 9:40 p.m. *Id.* at 99-105. Because of the poor quality of the video footage, it was not possible for witnesses at trial to positively identify the driver of the U-Haul truck. *Id.* at 102, 185-86. Testimony at trial, however, indicated that Lacey was known to travel around the area in a rented U-Haul truck. *Id.* at 102, 185-86.

As established above, Baker and Zeigler then smoked the drugs they received from Lacey, which resulted in Zeigler's death. *Id.* at 55-57, 174-179. Baker stated that Zeigler had not used any other illicit drugs that day, and Zeigler's toxicology report revealed the presence of cocaine in his blood. *Id.* at 44-46, 56-57, 175.

Based on the foregoing, we conclude that the record contains evidence sufficient to sustain Lacey's convictions of criminal use of a communication facility and delivery of a controlled substance (cocaine). The record reveals that Baker texted Lacey asking to purchase crack cocaine, Lacey responded "Ok," Lacey shortly thereafter arrived at their residence in a rented U-Haul truck, delivered the drugs to Baker and Zeigler, and that those drugs contained cocaine. Although the video evidence reflects that Lacey delivered the drugs around 9:40 p.m., as opposed to around 10:00 p.m. as Baker testified, this does not render the evidence insufficient to sustain Lacey's convictions of criminal use of a communication facility and delivery of a controlled substance (cocaine).

Our Supreme Court has explained that mere inconsistency and conflicts in witness testimony does not provide an appellate court a basis upon which to reverse a conviction on the grounds of evidentiary insufficiency. *Commonwealth v. Brown*, 52 A.3d 1139, 1165 (Pa. 2012). Moreover, to the extent Baker's testimony regarding the time at which Lacey delivered the drugs, Baker's testimony reflects that he was estimating the time of delivery

in his testimony and not testifying to an exact time. *See* N.T., 11/14/2022, at 52.

Likewise, we find unavailing Lacey's argument that the evidence was insufficient to sustain his convictions of criminal use of a communication facility and delivery of a controlled substance (cocaine) because police did not recover cocaine from the scene. As set forth above, both Baker and Zeigler used the drugs delivered by Lacey, Baker testified that Zeigler had not used any other illicit drugs on the day he died, and Zeigler's toxicology report revealed cocaine in his blood. N.T., 11/14/2022, at 44-46, 55-57, 175. Thus, the Commonwealth presented ample evidence that the drugs Lacey delivered to Baker and Zeigler contained cocaine. Accordingly, Lacey's third and fourth issues do not entitle him to relief.

For his fifth claim, Lacey argues that the trial court abused its discretion in allowing certain testimony by Officer Wheeling.[4] Lacey's Brief at 22-23. Specifically, Lacey contends that the trial court erred in permitting Officer Wheeling to testify that he had previously observed Lacey at Baker's and Zeigler's residence, that he had known Lacey to drive a rented U-Haul truck, and that Lacey was known to deal drugs out of Ohio. *Id.* Lacey maintains that "the jury [could] easily make the leap that due to these prior encounters that he is a 'bad guy,' since he was dealing with the police." *Id.* at 23.

---

[4] Officer Wheeling was one of the police officers who responded to scene on the night of Zeigler's death. N.T., 11/14/2022, at 181.

We review a trial court's decision to admit certain evidence according to the following standard:

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Wilson*, 273 A.3d 13, 19 (Pa. Super. 2022).

Although he does not cite to Pennsylvania Rule of Evidence 404(b), Lacey appears to assert that Officer Wheeling's testimony was improper character evidence.[5]  *See* Lacey's Brief at 22-23.  Under Rule 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Pa.R.E. 404(b)(1).  However, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Pa.R.E. 404(b)(2).  Thus, under Rule 404(b), evidence of prior bad acts "is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes," but "may

_____

[5]  We note that Lacey properly preserved this claim before the trial court by objecting to Officer Wheeling's testimony as inadmissible under Rule 404(b). *See* Defendant's Response to Commonwealth's Rule 404(b) Notice, 8/30/2022.

- 15 -

be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015) (en banc). Evidence may be admitted under Rule 404(b)(2) only "if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.*

At the outset, we observe that Officer Wheeling did not testify that Lacey was known to deal drugs out of Ohio or that he had prior dealings with the police. *See* N.T., 11/14/2022, at 184-86. Thus, Lacey's claim that Officer Wheeling did make such statements is entirely belied by the record.

Instead, the record reflects that, in addition to testifying about what he observed on the scene on the night in question, Officer Wheeling provided the following testimony about Lacey:

Q. Had you seen [Lacey] around this house in the months preceding July of 2020?

A. Yes.

Q. On how many occasions?

A. Several. I don't have an exact count but several, but more than three.

\* \* \*

Q. Had you seen the vehicles that [Lacey] had been there at their residence in?

A. Um, I know him to travel in different rented vehicles, rented by different people. And I knew him to travel also in a U-Haul rented pickup truck.

* * *

Q. What is his address?

A. I don't recall the exact address, but I know it came out of Youngstown, Ohio.

* * *

Q. Officer Wheeling, did you have an opportunity to see the video that was gotten from the house next door?

A. Yes.

Q. Okay. Officer Wheeling, are you a hundred percent able to say that the individual in that, [alighting] from this U-Haul truck, is the defendant in this case?

A. No. I couldn't say a hundred percent that it was him.

Q. Okay. But based upon your knowledge of who they were talking about, what would your opinion be as to who you saw in that video?

A. That I saw [Lacey] in the video.

Q. It matched the description --

A. Yes.

Q. -- that matched everything that you knew about him?

A. Yes.

*Id.* at 184-87.

Based upon our review of the record, we conclude that the instant testimony is not evidence prohibited under Rule 404(b), as it falls within the identity exception of Rule 404(b)(2). The testimony from trial regarding the video footage from a neighbor's doorbell camera footage that showed an

individual who was driving a rented U-Haul truck entering and leaving Baker's and Zeigler's residence around the time Baker testified Lacey delivered the drugs was of too low quality for anyone to positively identify as the person in the footage. ***See id.*** at 102, 185-86. Thus, Officer Wheeling's testimony was admissible to identify Lacey as the individual observed in the doorbell camera footage and the driver of the U-Haul truck. ***See*** Pa.R.E. 404(b)(2). Accordingly, we conclude the trial court did not abuse its discretion in admitting Officer Wheeling's testimony.

For his sixth issue, Lacey argues that the trial court erred in precluding two statements Tate made to Officer Kurt Gindhart ("Officer Gindhart") on the night of Zeigler's death. Lacey's Brief at 23-24. Office Gindhart was another police officer who responded to the scene the night Zeigler died. ***See*** N.T., 11/14/2022, at 79-80. Specifically, Lacey argues that the trial court should have permitted Officer Gindhart to testify that Tate told him that she administered NARCAN to Zeigler because he ingested marijuana and that she learned Zeigler was in medical distress from Baker. ***Id.*** at 24. Lacey maintains that the trial court abused its discretion in determining that these statements were inadmissible hearsay as he intended to introduce those statements, not for the truth of the matter asserted, but to show that Tate's statements were obviously false, as NARCAN is only used when a person is overdosing on an opioid, and not when a person has used marijuana, and Tate could not have learned of Zeigler's condition from Baker, as he was also

overdosing at that time. *See id.* Lacey contends that these statements would have allowed the jury to infer that by misleading the police, Tate was "covering her tracks," and that she supplied the drugs that ultimately killed Zeigler. *Id.*; *see also* N.T., 11/15/2022, at 5-13.

We conclude that the trial court did not err in precluding Tate's statements, as they were not relevant.[6] "The threshold inquiry with admission of evidence is whether the evidence is relevant." *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021) (citation omitted). "Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence." *Id.* at 1022 (citing Pa.R.E. 401(a), (b)).

Contrary to Lacey's assertion, Tate's statements do not make it more probable that she, and not Lacey, provided the drugs that caused Zeigler's death. There are myriad reasons why Tate may have made the statements to Officer Gindhart. With respect to her statement that she used NARCAN because Zeigler had ingested marijuana, she may have wrongly believed that NARCAN can be used on someone who has used marijuana. She may have also been trying to protect herself, believing that she could have been charged with possessory offense because she was using illegal substances that night,

---

[6] It is difficult to discern from the trial court's opinion whether it precluded this evidence because it was hearsay or because it was irrelevant. *See* Trial Court Order and Opinion Denying Post-Sentence Motions, 5/8/2023, at 8-10. We note, however, that we may affirm the trial court on any basis that appears in the record. *Commonwealth v. Moore*, 937 A.2d 1062, 1073 (Pa. 2007).

and she may have not known that she was protected under the "Good Samaritan Law."[7] Additionally, the record reflects that Tate was hysterical and police found her hard to understand on the night of Zeigler's death—it is therefore possible that she misspoke or that Officer Gindhart misheard her. *See* N.T., 11/14/2022, at 84. However, Lacey does not identify any record evidence, or any basis in fact to allow us to conclude, that Tate made these statements to hide the fact that she provided the drugs that killed Zeigler.

At base, the central problem with Lacey's argument as to each of these statements is, because Lacey did not call Tate to testify, we simply do not know what she actually said or why she made these statements. Further, because she did not testify at trial, her credibility was never a question before the jury. Because of the limited information the jury would have received regarding these statements, the jurors would have had little ability, if any, to assess the veracity of the statements and their impact on the case. Based on the foregoing, we conclude that the trial court did not abuse its discretion in precluding Tate's statements, as they do not make it more probable that Lacey was not the individual who supplied the drugs that killed Zeigler. *See Yale*, 249 A.3d at 1022.

---

[7] The "Good Samaritan Law" refers to the Drug Overdose Response Immunity statute, 35 P.S. § 780-113.7, which provides immunity from prosecution for possessory offenses under certain circumstances where an individual has aided an individual suffering from a drug overdose.

For his seventh issue, Lacey argues that the trial court erred in giving its jury instructions for the two charges of delivery of a controlled substance (cocaine and fentanyl). Lacey's Brief at 24-25. Lacey asserts that because the Commonwealth's theory of the case was Lacey delivered cocaine mixed with fentanyl to Baker and Zeigler, the trial court erred when it instructed the jury that it "must be satisfied beyond a reasonable doubt that [Lacey] delivered the [f]entanyl and [c]ocaine," when it should have instructed the jury that it must be satisfied beyond a reasonable doubt that Lacey delivered "fentanyl mixed with cocaine." *Id.*

It is well-settled law that to properly preserve a challenge to the adequacy of a particular jury instruction, the defendant must make a specific objection to the instruction at trial. *Commonwealth v. Hitcho*, 123 A.3d 731, 756 (Pa. 2015); *see also* Pa.R.A.P. 302(b) ("A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of[.]"); Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate[.]"). In this case, Lacey did not object to the jury instructions at any time at trial and he does so now for the first time on appeal. Accordingly, Lacey has failed to preserve his challenge to the jury instructions for review.

For his eighth issue, Lacey argues that the trial court erred by failing to find prosecutorial misconduct based upon the prosecutor expressing his personal opinions about Lacey's guilt, stating that Tate cleaned the scene of drugs and drug paraphernalia to protect her drug dealer, and characterizing Baker's text to Lacey in which he requested the drugs as "cold." Lacey's Brief at 26-29. "The failure to raise a contemporaneous objection to a prosecutor's comment at trial waives any claim of error arising from the comment." **Commonwealth v. Ali**, 10 A.3d 282, 293 (Pa. 2010); **see also** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). In this case, Lacey did not raise a claim of prosecutorial misconduct at any time before the trial court and does so now for first time on appeal. Accordingly, Lacey has failed to preserve his claim of prosecutorial misconduct for review.

Finally, Lacey argues the trial court erred in calculating his prior record score because it calculated his conviction of breaking and entering in Ohio as if it was a conviction of criminal trespass in Pennsylvania. Lacey's Brief at 29-30. "It is well[]settled that a challenge to the calculation of a prior record score goes to the discretionary aspects, not legality, of sentencing." **Commonwealth v. Shreffler**, 249 A.3d 575, 583 (Pa. Super. 2021). "When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal." **Id.**

To invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence, an appellant must satisfy a four-part test:

> (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post[-]sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

*Commonwealth v. Baker*, 72 A.3d 652, 662 (Pa. Super. 2013).

Our review of the record reveals that Lacey specifically withdrew this sentencing claim in his supplemental post-sentence motion after he determined that the trial court had, in fact, correctly calculated his prior record score. *See* Supplemental Post-Sentence Motion, 3/30/2023, at 5. Additionally, Lacey did not include in his appellate brief a statement pursuant to Rule 2119(f), any argument that he has raised a substantial question, or any other developed argument, including citations to pertinent authority, setting forth how the trial court erred in calculating his prior record score that is capable of meaningful appellate review. We therefore conclude that Lacey has waived his final issue on appeal. *See Baker*, 72 A.3d at 662; *see also Commonwealth v. Johnson*, 985 A.2d 915, 924-25 (Pa. 2009) (holding that the failure to include citations to relevant authority constitutes waiver of the issue on appeal, as it is not the role of this Court to develop an appellant's argument where the brief provides mere cursory legal discussion).

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

8/8/2024